# CASES

IN THE

# SUPREME JUDICIAL COURT

OF THE

# STATE OF MAINE.

———————◆———————

KENNEBEC & PORTLAND RAILROAD COMPANY, in equity, *vs.*
PORTLAND & KENNEBEC RAILROAD COMPANY and others.

*Mortgage of railroad, franchise, and other property—foreclosure of.*

The Kennebec & Portland Railroad Company, on the 15th of October, 1852,
pursuant to a vote of its directors, mortgaged its road, franchise, and other
property to certain persons named, in trust, for the benefit of the holders of a
certain class of its bonds, duly issued by the company, with interest payable
semi-annually. The company having neglected to pay the interest coupons
due on the bonds, on and after April 1, 1856, the trustees, upon due application
by the holders of the bonds to an amount exceeding one-third of the amount
of the mortgage, on the 18th of October, 1859, in accordance with the Public
Laws of 1857, c. 57, gave the public notice, and caused the same to be published,
and a copy of the printed notice recorded at the time and place and in the
manner prescribed in said statute, for the purpose of obtaining a foreclosure of
the mortgage for the breach of its condition. In a bill to redeem, *Held*, by a
majority of the court, that the mortgage was legally foreclosed.

BILL IN EQUITY against the Portland & Kennebec Railroad
Company, John Patten and Marshal S. Hagar, trustees, Richard
D. Rice, George F. Patten, William D. Sewall, Darius Alden, N.
M. Whitmore, Geo. F. Shepley, J. B. Brown, and Horatio N.
Jose.

Case heard on bill, answer and proofs.

VOL. LIX.          2

The bill alleges, substantially, that in 1850, the plaintiff corporation was a legal corporation, owning and possessing a railroad extending from Augusta, through Brunswick and Yarmouth, to Portland, thence to a junction with the Portland, Saco & Portsmouth Railroad, at Cape Elizabeth, with a branch from Brunswick to Bath.

That in constructing the road between Augusta and Yarmouth, including the branch, the plaintiff corporation issued stock, known as "original stock," to the amount of seven hundred thousand dollars, and "old preferred stock" to the amount of two hundred and forty thousand dollars, on the last named of which dividends of ten per cent per annum were payable.

That to construct the road from Yarmouth to the Junction, the plaintiffs agreed with persons unknown, that if they would furnish the means, exclusive of land damages, depots, and furniture, the plaintiffs would issue to them stock known as "Yarmouth stock," and secure to the holders thereof the whole income of that portion of the road, until they were paid the principal and ten per cent annual interest, and secure the payment by a first mortgage of that portion of the road and franchise, and that they accordingly issued stock to the amount of two hundred and four thousand and two hundred dollars payable at ten per cent, and secured the same by a mortgage to Reuel Williams, John Patten, and J. B. Carroll, in trust, who accepted.

That to construct and equip the railroad, the plaintiffs, under due legislative authority, borrowed of certain towns along the line of the road, and of persons unknown, eight hundred thousand dollars in money and scrip, and secured them by a mortgage of nineteen-twentieths of the road and franchise to commissioners of the sinking fund, provided by the loan act, and another mortgage of one-twentieth to John Patten, Marshal S. Hagar, and Joseph McKeen, in trust, subject to the former mortgage; that in 1851 the plaintiffs issued and sold bonds, known as "first mortgage bonds," to the amount of two hundred and thirty thousand dollars, with interest payable semi-annually, and secured the same by mortgage to Patten,

Hagar, and McKeen, in trust, subject to the prior mortgages; that in 1852, the plaintiffs issued, and sold in part, "second mortgage" bonds to the amount of two hundred and fifty thousand dollars, and secured them by mortgage to Patten, Hagar, and McKeen, in trust, subject to prior mortgages; that in 1854 the plaintiffs issued "new preferred stock" to the amount of one hundred and twenty thousand dollars, payable with interest at three per cent semi-annually, making the entire cost of the road, completed and equipped, two million five hundred and forty-four thousand two hundred dollars; that in 1853 the old preferred stock was surrendered and new certificates, on which semi-annual dividends of three per cent were payable, were issued to, and received by the holders thereof, and the holders of the Yarmouth stock relinquished, for the benefit of the "old preferred stock," four of the ten per cent, payable as mentioned.

That in 1857, the interest on the first and second mortgage bonds not having been paid, Patten, Hagar, and McKeen, as trustees, in behalf of the bondholders, and for breach of the condition of the mortgages, took the possession and management of the road, franchise, etc., and continued to hold the same until 1864, taking the income, rents, and profits.

That in 1861, one Lambard, Southard, Thompson, Alden, Whitmore, Patten, and Sewall were elected directors of the plaintiff company, and so continued until December, 1864, Lambard being president; that it was their duty to do all things necessary for the faithful administration of the affairs of the corporation; and that the trustees ought to be holden to account to the plaintiffs for what income and profits might have been received under proper management of the road.

That the trustees so carelessly, negligently, and unskillfully managed the road and its affairs, that the net earnings were less by two hundred thousand dollars per annum than they would have been under faithful and proper management.

That the trustees combined with Alden, Whitmore, Sewall, and Patten, a majority of the directors, and with one Rice, Brown,

Shepley, and Jose, together with other persons unknown, contriving and intending to obtain for themselves and their associates the possession, management, and ownership of said road, franchise, etc., bought a large amount of original, preferred, and Yarmouth stock, bonds, mortgages, and other claims which the plaintiffs were liable to pay, amounting to seven hundred thousand dollars, for much less than the real value thereof, with money belonging to the plaintiff company, being earnings of the road.

That the late Reuel Williams owned the original, preferred, and Yarmouth stock, etc., secured by a mortgage of the rolling stock of the road, to the amount of five hundred thousand dollars, and in 1861 offered to sell the same to the trustees, for the benefit of the plaintiffs, for one hundred and thirteen thousand dollars; but the trustees, contriving and intending to obtain for themselves and associates the ownership of the road, improperly declined to accept the offer: that afterwards the same were purchased of Williams by Rice and Alden for the benefit of the trustees and associates, for the purposes mentioned, for the sum of one hundred and thirteen thousand dollars, which was paid out of the earnings and income of the road, and the defendants claim to hold the same.

That directors, Alden, Whitmore, Sewall, and Patten, combining with the trustees and their associates before mentioned, for the purpose of becoming the owners of the road, in violation of their trusts, neglected to pay the interest upon and redeem the bonds.

That in 1863, the plaintiffs, through Lambard, having brought in this court a bill to redeem the mortgages, directors Alden, Whitmore, Sewall, and Patten, without the knowledge of President Lambard, and for the purpose mentioned, called and held a meeting of the directors, and voted to dismiss the bill which was accordingly done.

That the road and franchise, since possession thereof was taken by the trustees, has been of sufficient value if administered according to the true tenor of the trusts, to pay the interest on and redeem the bonds; but the trustees and directors, not regarding their trusts, applied the same to the purchase of stock, bonds, etc., for the benefit

of themselves and associates, and allowed the interest to go unpaid and the bonds and mortgages to remain unredeemed.

That subsequent to 1863, the Portland & Kennebec Railroad Company, as they claim, were created a body corporate, and became possessed of said railroad, property, and franchise, claiming to hold the same by some title derived by, through, or under the mortgages given to secure the first and second mortgage bonds ; and the plaintiffs pray that the defendants may set forth by what right and title they claim to hold the same, and have appropriated the same to their own use, and have not paid the dividends on the preferred stock, nor the interest on the first mortgage bonds, nor made provision to pay the principal.

That the Portland & Kennebec Railroad Company took whatever title they have, if any, with notice of the trusts created by the agreements and undertakings of the plaintiffs, and of the equitable rights of the holders of said bonds, and of the old and new preferred stock created thereby, to demand and enforce payment of their interest, dividends, etc., out of the income of said property.

That the trustees and directors and their associates became members of and compose the defendant corporation.

That the money paid for the stock and bonds was used in the construction and equipment of the road, and no dividends have been paid thereon since April 1, 1856.

That in 1862, Marshal Hagar, deceased, and Sarah Hagar, having been duly appointed administratrix of his estate, accepted the trust.

That in 1862, and again in August, 1865, the plaintiffs demanded of the trustees and the Portland & Kennebec Railroad Company a true account in writing, in order that the plaintiffs might pay the amount equitably due, and they unreasonably refused to render the account, and allow a redemption, although the plaintiffs tendered to them the amount due on the — day of —, A. D. 1865.

The prayer of the bill was, among other things,

That the Portland & Kennebec Railroad Company might state the amount of income received by them since they came into pos-

session, and that they and the trustees may be decreed to come to a fair and just account with the plaintiffs in respect to the net income of the mortgaged premises, and be enjoined from using or appropriating the income of said railroad, property, and franchise, otherwise than in accordance with the trusts and equitable liens charged upon the same by the plaintiffs; and that the plaintiffs may be let in, to redeem the mortgaged premises, on payment to the defendants of what shall be due after deducting therefrom what the said trustees and the Portland & Kennebec Railroad Company have, or might have received from the rents, profits, and income of the mortgaged premises; and that the defendants be decreed to pay and account to the plaintiffs for what shall appear to be due on taking account, and deliver possession of the mortgaged premises to the plaintiffs, with the furniture, rolling stock, books, writings, and records relating thereto, and for general relief. Duly signed and sworn to Oct. 24, 1865.

All the defendants answered.

The Portland & Kennebec Railroad Company answered, admitting the lawful existence of the plaintiff corporation, ownership, and possession of the road, the issuing of stocks and the giving of bonds and mortgages, as alleged in the bill; that the interest on the bonds not having been paid, the trustees took possession of the road, franchise, and furniture, in behalf of the bondholders, they having duly organized for that purpose, pursuant to law, and so continued in possession until Jan. 1, 1864, except that they were dispossessed of the furniture by the paramount claim of Reuel Williams.

The defendant denied all knowledge or belief in regard to the trustees' negligence in managing the road, in any combination to defeat the plaintiffs, of the application of the funds as alleged, of any combination, by the directors in the plaintiff corporation, with the trustees and associates to become owners of the road, or of any neglect to pay the interest of and redeem the bonds; or that the earnings were sufficient, with proper administration, to pay the interest of and redeem the bonds; or that the trustees, disregarding their trust, applied the earnings for the benefit of themselves and associates.

The defendant corporation admitted that it was created a body corporate in 1862, by the organization of the second mortgage bondholders into a corporation, after the foreclosure of the mortgage, under the name of the Portland & Kennebec Railroad Company, in pursuance of the statute.

That the plaintiffs neglected and refused to pay the semi-annual coupons upon its second mortgage bonds (as well as those upon its first mortgage bonds) that fell due after April 1, 1856, up to and including those payable April 15, 1859, for more than ninety days after the same fell due and were duly demanded, and the holders of more than one-third of the whole of the second mortgage bonds in amount, secured by said mortgage, on which were the dishonored coupons, applied in writing to the trustees to have the mortgage foreclosed.

That the trustees, on May 18, 1859, foreclosed said mortgage, in accordance with the statute (reciting the details of the action).

That the plaintiffs continued their neglect to pay the dishonored coupons, though payment, after maturity, was demanded, and though the coupons, amounting to over forty thousand dollars, were presented to the trustees more than thirty days before the time of redemption of the mortgage expired, to wit, more than thirty days before May 20, 1862, and remained in the hands of the trustees for payment, long after the expiration of the time of redemption; that none of them were paid, or tender offered, or means procured, or any bill to redeem brought, or any money in the hands of the trustees with which to pay.

That more than three years having elapsed from the time of the publication of the notice, and the mortgaged property not having been redeemed, the second bond mortgage was foreclosed; that on 5th November, 1862, the holders of the second mortgage bond, the mortgage having been foreclosed, organized into a corporation, under the name of the Portland & Kennebec Railroad Company, in pursuance of the statute, and have since continued to be a lawfully created railroad corporation.

That at a lawful meeting of the holders of the first mortgage

bonds, notified and held on Dec. 14, 1859, by a vote duly passed, the trustees were directed to take possession of the mortgaged premises, for the purpose of managing same on behalf of the holders, on September 1st, then next; that they accordingly took possession and continued therein, receiving the earnings thereof, until Jan. 1, 1864, when, in accordance with the statute, the trustees conveyed the right and title, derived by virtue of the deed of the second mortgage in and to the road, franchise, etc., to the defendant corporation; that this corporation negotiated with the first mortgage bondholders to prevent consummation of the proceedings to foreclose, and the coupons since falling due on said first mortgage bonds, city and town bonds, and Yarmouth stock, have been regularly paid out of the earnings.

That the road was in bad condition, inadequately furnished; that no right of way was secured for a long distance from the depot of the Portland, Saco & Portsmouth Railroad, and no depot accommodation; that the trustees, from necessity, made large expenditures, over and above the earnings, to purchase lands for depots, right of way, and to build a new road from Westbrook to the junction, and mortgaged the property therefor. ·

That by an act passed Jan. 28, 1865, the defendant corporation were authorized to build the road on its new location, to issue stock and raise funds therefor, and to extinguish prior incumbrances; and that they issued and sold stock, bonds, etc., as detailed.

The answer contained a detailed statement of receipts, and denied any payment or tender, or demand of any account or refusal to account.

Denies that the plaintiff was or is possessed or seized of the equity of redemption of the mortgaged premises or any part thereof.

As a majority of the court concur only in the result, the other answers and all the proofs, excepting the following notice of foreclosure, are omitted:

" Whereas the Kennebec & Portland Railroad Company, on the 15th day of October, A. D. 1852, by their mortgage deed of that

date, conveyed to the subscribers, Joseph McKeen, John Patten, and M. S. Hagar, as trustees to take and hold in trust for the security of the holders of the bonds of said company then authorized to be issued, ' all their railroad, as now made, from Portland to Augusta, and from Brunswick to Bath, inclusive, and all their corporate property, real and personal, and the franchise of said company, including the road and superstructure, and all the land conveyed to said company by others, for a description of which reference is to be had to the several deeds recorded in Cumberland, Lincoln, and Kennebec, as well as the right of way paid for, and all the buildings thereon, and the personal property, consisting of engines and tenders, passenger, freight, platform, and dirt cars, snow-ploughs, and apparatus of every description, subject, however, to prior mortgages thereon,' upon the condition and for the purpose of securing the payment of bonds for two hundred and fifty thousand dollars, on the 15th day of October, A. D. 1864, and of well and promptly paying semi-annually the interest on their bonds, dated Oct. 15, 1852 (coupons on said bonds), all which more fully appears by the said mortgage deed, which is recorded with the records of deeds for Kennebec county, book 179, p. 370.

" And whereas the said Kennebec & Portland Railroad Company have refused and neglected to pay to the holders of said bonds, within ninety days after presentation for payment, the interest (coupons of said bonds) due since April 1, 1856, and still refuse and neglect to pay the same. And whereas, on the fifteenth day of April, A. D. 1859, Reuel Williams, owning and holding forty-eight thousand and eight hundred dollars of said bonds ; J. L. Cutler, trustee, owning and holding one thousand dollars of said bonds ; D. Alden owning and holding seven thousand and six hundred dollars of said bonds ; W. A. Brooks owning and holding one thousand dollars of said bonds ; Wm. R. Smith, owning and holding fifteen hundred dollars of said bonds ; L. W. Lithgow, and, as trustee, owning and holding twenty-five hundred dollars of said bonds ; Wm. D. Sewall, owning and holding seven thousand dollars of said bonds ; Wm. D. Sewall, trustee, owning and holding thirty-three hundred

dollars of said bonds; Geo. F. Patten owning and holding thirty-five thousand dollars of said bonds, and H. S. Hagar owning and holding forty-three hundred dollars of said bonds; in all, amounting to one hundred and twelve thousand dollars of said bonds, being more than one-third of said mortgage, all the interest (coupons) of said bonds since April 1, 1856, being unpaid and dishonored, made application, in writing, to the subscribers to have said mortgage foreclosed, because the semi-annual interest (coupons) on said bonds have not been paid since April 1, 1856, and now remain unpaid, whereby the conditions of said mortgage deed have been and now are broken.

"Now, therefore, the subscribers give notice, that, by reason of the breach of the condition in said mortgage to them, by said Kennebec & Portland Company, in refusing and neglecting to pay the semi-annual interest (coupons) due upon said bonds since April 1, 1856, they claim to foreclose the said mortgage.

JOS. McKEEN, ⎫  
JOHN PATTEN, ⎬ *Trustees as*  
M. S. HAGAR, ⎭ *aforesaid.*

"BRUNSWICK, May, 18, 1859."

"KENNEBEC, ss.

"CLERK'S OFFICE, SUPREME JUDICIAL COURT.
AUGUSTA, May, 1868.

"I hereby certify that the foregoing 'Notice of Foreclosure' was copied by me from the *Kennebec Journal*, the newspaper published by the State printers, and printed at Augusta, in the said county of Kennebec, and was published in said newspaper three weeks successively, to wit, on May 20th and 27th, and June 3d, 1859, and that said copy is a true and correct copy. I further certify that I have examined the newspaper called *The Age*, published at said Augusta, in said county of Kennebec, and find the same notice printed therein in the issues of May 26th, and June 2d and 9th, 1859,—also, the *Eastern Times*, a newspaper published at Bath, in the county of Sagadahoc, and the *Brunswick Telegraph*,

a newspaper published at Brunswick, in the county of Cumberland, and I find the same notice printed in those papers, under the dates respectively of May 20th and 27th, and June 3d, 1859. I further certify, that, in the list of bondholders mentioned in said notice, I find the name of Hagar printed ' *M.* S. Hagar ' in the *Age*, while in the other papers it is ' *H.* S. Hagar.'

WM. M. STRATTON, *Clerk of said Court.*"

" BRUNSWICK, June 20, 1859.

" We hereby certify that we have caused the above notice of fore-closure to be printed three weeks successively in the newspaper published by the State printer, and in a newspaper published in each of the counties into which said K. & P. R. R. extends, viz. : in the *Kennebec Journal*, published at Augusta, in the county of Kennebec ; the newspaper published by the State printer, on the 20th and 27th days of May, and the 3d day of June, A. D. 1859 ; in the *Age*, published in Augusta, in the county of Kennebec, on the twenty-sixth day of May, and the second and third days of June, 1859 ; in the *Eastern Times*, published in Bath, in the county of Sagadahoc, on the twentieth and twenty-seventh days of May, and the third day of June, 1859 ; and in the *Brunswick Telegraph*, published in Brunswick, in the county of Cumberland, on the twentieth and twenty-seventh days of May, and the third day of June, 1859. We certify these facts and dates to be recorded in each of said counties, in its Registry of Deeds, within sixty days from the time of each said first publication, in conformity to the provisions of section 55 of chapter 51 of the Revised Statutes of Maine.

JOS. MCKEEN,
JOHN PATTEN, } *Trustees as*
M. S. HAGAR, } *aforesaid.*"

" Recorded according to the original, received June 21, 1859, at 9h. A. M.

Attest : AUGUSTUS F. GERRISH, *Register.*"

*A. G. Stinchfield* (and with him *Davis & Drummond*), for the plaintiffs.

*A. Libby*, for the defendant corporation.

*J. W. Bradbury*, for the trustees and individual defendants.

KENT, J. The object and prayer of this bill is, that the plaintiff corporation may be let in to redeem the mortgaged premises, viz., its road and all its corporate property, described in the deed to trustees for the benefit of what are termed the second mortgage bonds and bondholders.

There is no question that the plaintiff corporation was the original owner of the road, and that it had the rights of a mortgager under the deed referred to. The question, if not the sole question before us is, whether that right of redemption has been legally and effectually foreclosed. If it has been, there would seem to be no equity or title to the property left in the plaintiffs. If it has not been, the plaintiffs should be let in to redeem.

Indeed it would seem, if there has been no legal foreclosure, there can be no legal existence of the defendant corporation,— for that exists only by the fact of a prior extinguishment of the right of redemption. Stat. 1857, c. 57.

In the argument several objections are started touching the validity of the mortgage deed. It is said that the vote of the stockholders did not authorize the president to mortgage the personal property or the franchise, and that therefore the deed, at least as to those particulars, was unauthorized and void.

An answer to this question, which certainly seems formidable, is that the bill nowhere sets up or alleges these matters, but simply sets out the existence of a legal mortgage, but denies any foreclosure and asks to redeem. The argument is, that if there was no legal mortgage no title passed, and the remedy would be at law or in equity to obtain a decree to declare the deed void, for the purpose of removing a cloud from the title of the plaintiffs.

On examination of the bill, it will be seen that it sets out in the

commencement a full and very particular statement and history of the various incumbrances and mortgages which had been created and executed besides the issue of stock certificates. It names the Yarmouth extension, $204,000, to secure which a mortgage was given to trustees. It then alleges that another mortgage was given to other trustees of the railroad and franchise subject to the prior mortgage, to secure certain cities and towns which had loaned money to the corporation. This debt it is stated was $800,000. It next states that the corporation issued "first mortgage bonds" to the amount of $230,000, in the year 1851, payable in ten years, and secured the same by a mortgage to the same individuals as trustees, subject to the mortgages before named. Then comes the allegation in reference to the mortgage now in question, " that afterwards, in the year 1852, the said corporation duly issued, and sold in part, bonds known as the second mortgage bonds, to the amount of $250,000, payable in twelve years with semi-annual interest, according to the tenor of coupons or interest warrants, thereto annexed, and secured the same by a mortgage of said railroad to said Patten, Hagar, and McKeen, who were trustees in the other mortgages, in trust, subject, however, to the other mortgages hereinbefore named." The bill then asserts that " afterwards, in the year 1857, the said trustees," the interest on said first and second mortgage bonds not having been paid by said corporation, " in behalf of such bondholders, and by reason of the condition of the mortgage, given to secure said bonds, took the possession and management of said railroad, franchise, and furniture, and so continued the possession up to 1864."

There is further on a statement that the defendant corporation became possessed of said railroad, property, and franchise by some title derived by, through, or under the mortgages given to secure the first and second mortgage bonds, and a request for a disclosure of the title or claim set up.

The prayer of the bill is " to be let in to redeem the mortgaged premises, on payment to the defendants of what shall appear to be due to them, if anything, after deducting what the trustees and the defendant corporation have, or ought to have received from the

profits and income of said mortgaged premises. The bill also prays for general relief.

The answers of the defendants, all admit the statement of mortgages and incumbrances as made by the plaintiffs. There is, therefore, no issue made by the bill, answers, or proofs, as to the legality or binding force of these several mortgages. The bill is one for redemption and that only, from a certain specified mortgage,—not to cancel or restrict it, or to set it aside. There are, doubtless, many things stated in the bill, and elicited in the proofs which might be of importance, in adjusting accounts and equities, if the foreclosure is found to be ineffectual. But the preliminary and vital question is whether the mortgage has been foreclosed. The bill does not set up any original illegality, or want of binding obligation in the mortgage.

But if these objections, which have been stated in the argument, were fully open, we should be hardly ready to say that they were so clearly established as to require or justify the decision, that the mortgage was void. By the direct vote of the stockholders, authorizing the issue of the second mortgage bonds, the president was authorized " to execute a mortgage of the road and appurtenances, subject to prior mortgages to secure said bonds."

This authority is in terms broad and ample. It seems to us no forced construction, which should hold that the evident design was to give power to mortgage the real and personal property of the corporation, belonging to, used with, and which was in fact, practically, the road and appurtenances. Even if the word " appurtenances " had been omitted, and it had been simply a power to mortgage " the road," it would be too narrow a construction to limit the power to the road-bed and rails. By the terms used, it is evident that the corporation had in view the same property and rights that it had before mortgaged by the deeds to which this is subject. The vote, which authorized the mortgage to secure the first mortgage bonds, was more specific and included, in terms, "the franchise and furniture of the road." It would be difficult to limit, by any satisfactory definition of the words " the road and its appurtenances,"

the force and effect of them, short of a power over all that was the road itself, and all that belonged to it as a railroad. Considering the object of the vote, the prior votes and mortgages referred to in this vote, and the evident intent to give full security on all the property, rights, and interests still remaining in the corporation, we see no reason to doubt, that power was given sufficient to cover the actual grant of the property, including the franchise named in the deed.

But it is objected that the corporation had no power to mortgage its franchise, without the consent of the legislature. The argument is, that the grant being to certain persons and their associates, the law will not sanction or permit the transfer to other persons or corporations.

It is by no means settled that this doctrine is recognized or admitted universally. It is doubted or denied in several cases in different States. The case of *Shepley* v. *G. T. R. R.*, 55 Maine (published since the arguments were made in this case), is substantially a denial by our court of this doctrine, and the reasons there given are cogent and satisfactory, and are based on common sense and practical views, rather than on theoretic speculations, which have little basis in fact or experience.

But it is not denied that if the rule be, as first stated, subsequent ratification or recognition is equal to prior or direct assent by the legislature. An examination of the various enactments in relation to the roads and railroads generally leads to the conclusion that the State cannot and does not object. This objection, it is to be marked, is one resting solely on public policy, and the supposed interest of the State. It is one rather for the State than for the company to interpose.

Again; in this case the franchise — the right to be a corporation and to exact and secure tolls and fare—becomes of little practical importance to the present defendant corporation. If the foreclosure of the mortgage on the other property mortgaged was perfect and sufficient, the statute authorized the body of bondholders to organize as a corporation at once, with all the powers of the for-

mer corporation, and to, in effect, assume a new franchise and act under it. If, then, the franchise of the old corporation was not mortgaged, or if the conveyance of it in mortgage was illegal for want of legislative consent, and if, therefore, it has not passed out of the old corporation, yet, if all the other property has passed to the second bondholders, their new legalized corporation is sufficient for all practical purposes, and exists by the express enactment of the legislature. The complainants recognize the existence of the corporation thus formed, by instituting this bill against them and requiring them by the new name to answer, and to account and to receive what may be found due, and to release the mortgaged property.

The plaintiffs having called in the bill for the disclosure of the defendant's title, and for the grounds on which they assume to hold the railroad and its franchise and property,— the answers place that claim on the ground of the foreclosure of the second bond mortgage, and rest upon that. The answers and evidence show that the foreclosure was made under the provisions of the statute of 1857, by publishing in the newspapers and recording as therein required. The question is whether that foreclosure was effectual.

It is objected in the first place that the statute does not, by its terms and scope, apply to mortgages executed before its passage. We think that it is evident that it was the intention of the legislature to provide a mode for the foreclosure of all existing, as well as all subsequent railroad mortgages. The statute was passed to give what may be considered by those interested, or some of them, a simple and effectual mode of securing and enforcing the rights of both mortgagers and mortgagees in such deeds. The language is sufficiently explicit, " whenever any railroad corporation shall have mortgaged its franchise," etc. The object in view was to reach all this class of conveyances, and the words used are sufficiently retrospective in their scope to include them.

But a more serious question is raised and pressed upon us with force and earnestness, and requires full consideration.

It may be stated to be in substance this: that if the statute is

retrospective, so as to operate upon this mortgage, it is unconstitutional, and therefore void so far as this mortgage is in question. And it is unconstitutional because, if retrospective, it violates the provision of the Constitution of the United States, which prohibits a State from passing any law impairing the obligations of contracts.

It is insisted that this mortgage, having been given in the year 1852, must be governed by the law then existing, as to its redemption or foreclosure, and that the laws or rules then in force were so a part and parcel of the contract and so incorporated into it, that any change in the mode of foreclosure would impair the obligation within the prohibition. In following out this idea it is contended, that, in 1852, there was no mode by which a railroad mortgage like this could be foreclosed, under any of the existing statutes of the State, or by any of the established rules of law, applicable to mortgages and their foreclosure. The only mode by which it could be effected, it is claimed in the argument, is by a bill in equity to foreclose, instituted under the general equity powers of an equity court, by which a sale, or a strict and immediate foreclosure, would be ordered.

It is important to ascertain what provisions of law then existed for the foreclosure of mortgages in Maine, when this contract was entered into.

The statute law had always recognized the existence of a right in the mortgager of real estate to redeem the same after breach of the conditions, and had fixed that term at three years, after the commencement of proceedings to foreclose the equity. At the same time, it had provided by statute the mode of proceeding on the part of the mortgagee to foreclose. These modes were specifically stated and exactly defined. One mode was by entry and possession for the purpose of foreclosing by the written consent of the mortgager or his grantee. One by a peaceable entry, in presence of witnesses, whose certificate of the fact must be recorded in the Registry of Deeds. Another mode was by a suit at law, declaring, in a real action, in the usual form, in which action either party, on motion and proof that the title claimed was in mortgage, might have

a conditional judgment entered as on mortgage, in which it was decreed that if the debt was not paid in two months, an execution for possession should issue.   If possession was taken under the judgment at law, the equity would be foreclosed in three years, after such execution of the writ of possession.   Another mode of more recent date, but one existing some years before 1852, and now on the statute book, is by a publication in a newspaper without entry or suit, describing the mortgage, the breach of the condition, and intention thereby to foreclose the mortgage.   The usual time of redemption, viz., three years, is allowed after the publication.   We may say, in passing, that this mode of foreclosure by advertising is in all essential particulars the same as that provided for in the statute of 1857 for railroad mortgages with the same rights and time for redemption.

The foregoing were all the modes by which a mortgage of real estate could be foreclosed in Maine in 1852.   It was decided in the case of *Ireland* v. *Abbott*, 24 Maine, 155, that since 1821, in Maine a mortgage of real estate cannot be foreclosed, except by pursuing one of the modes provided by the statute for that purpose.

The law in relation to mortgages of personal property in 1852, gave sixty days after breach for redemption.   It was decided in several cases before 1852, that the title of the mortgagee became absolute as to the personal property mortgaged, at the expiration of sixty days without any action or proceeding to foreclose.   *Thompson* v. *Moore*, 36 Maine, 47 ; *Clapp* v. *Glidden*, 39 Maine, 448.

More recently, by subsequent statutes, the mortgagee in such cases must move to foreclose, but in 1852 the title to real estate, whatever that term includes, could be foreclosed in either of the modes pointed out in three years, and the title to personal property by lapse of sixty days after non-payment.

It is claimed that this railroad mortgage could not be foreclosed under any law existing in 1852.   It would seem clear enough that whatever came under the name of real estate might be foreclosed, under the statute relating to real estate, and whatever was personal estate would be foreclosed in sixty days, after the failure to pay

any coupons. Now the foreclosure actually attempted in 1859, although, following manifestly the then recent act of 1857, was yet, in substance, a compliance with the provisions of the statutes existing in 1852, viz., the mode by advertising. It is admitted in the argument of the plaintiff's counsel that "a mortgage embracing real estate, and also personal estate, distinct from each other, might be foreclosed as to the realty, as a farm and farming tools on it." But he contends that the connection between the franchise and the easement is different. He urges that the franchise and easements could not be foreclosed by the then existing law, and that, therefore, this mortgage could not be. He admits that the real estate could be foreclosed under the then existing statutes. Perhaps the remarks before made, touching the franchise, might be applicable on this point, if all the real estate, including all that can properly come under that term, and all the personal property, including all that can come under that term, were legally foreclosed, under the statutes existing in 1852, by the published notice as to the one and by the expiration of sixty days, after non-payment, as to the other.

But if there were, in fact, no existing provisions by statute or common law, by which in 1852 this mortgage could be foreclosed, a question would arise, how would the parties stand? Why should not the old common-law doctrine apply, of a forfeiture of the entire property on a failure of strict compliance. But the plaintiff's counsel contends that there was another and existing mode of foreclosure in this State at that time, viz., by a bill in equity by the mortgagee to enforce a foreclosure. And he further contends, that this mode was so a part of the mortgage or contract, that a foreclosure by any other mode impaired the obligation of the contract, as before stated.

This leads us to an examination of the origin and nature of this equity of redemption, and the various modes by which a foreclosure or termination of this equitable right has been allowed to be effected in England and in various States of the Union. The first reflection, after such examination, is that there is no fixed, uniform, and universally acknowledged rule or mode, none that may be said

to accompany every mortgage, as a part of it, and to be the sole and inflexible way to enforce its foreclosure.

It may aid us in the consideration of the precise question before us, which must not be lost sight of, to examine briefly the origin and the judicial history of the equity of redemption, or the right to a reconveyance or restoration of the property conveyed by payment or performance after the day.

There is nothing in the ordinary mortgage deed itself, which by any language gives or indicates any such right. The conveyance is first absolute. It is then qualified with the proviso, that if the note, debt, or claim specified is paid when due, the deed is to be void. In the deed in question the proviso is "if such railroad company shall well and promptly pay," etc. This is the contract at law, as a pledge. There is no intimation of any right to redeem beyond the day of payment.

At common law, as is well settled and perfectly understood, by non-payment, at the day, strictly according to the language of the deed, the mortgaged estate becomes the absolute property of the mortgagee without action or process. The common law has never yielded this doctrine, except when the legislature has changed it. It has left it to the courts of equity to create and to enforce equities. One of the most interesting portions of English judicial history is that which records the long, earnest, vigorous, if not violent struggles between the judges of the common law and equity courts on this matter. The sturdy and obstinate old common-law judges stood firmly and unyieldingly by the contract as it read, and rejected all claims to qualify or extend it, or to create new equities or rights. But the courts of chancery, at an early period, held that until foreclosed by decree the mortgager, by applying within a reasonable time and offering to pay debt, interest, and cost, etc., might redeem the estate forfeited at law. This right to redeem, because it was created by, and could only be enforced in the courts of equity, has been termed the mortgager's "equity of redemption." On the other hand, the mortgagee might, after the estate had become forfeited at law, file a bill in chancery to foreclose the equity. Where-

upon the court, after account taken, will direct payment to be made within six months thereafter, or, in default, that the mortgage shall be foreclosed. The chief clerk appoints a day for payment, and upon default the mortgagee may obtain a final decree or order for foreclosure, which, when signed and enrolled, will foreclose the mortgage and fix the title absolutely in the mortgagee. A sale would sometimes be decreed in special cases, where in the judgment of the equity court it would be right and best for all parties. But a sale, unless by statute requirement, will not be ordered as a right, vested and fixed, which a party may insist upon. A sale under the general equity jurisdiction is by no means the certain or even the common mode of foreclosing the equity. It is true, that the original jurisdiction of the court of equity which it assumed by main strength, has been extended and regulated in England by statutes recently. And the cases in which the court may direct a sale, instead of a foreclosure of the title, have been enlarged and specified by English statutes of 15 and 16 Vict. But this rests on statutes not enacted and not in force here.

It is important to mark and remember the distinction between the powers and directions given by statute, and those which have been the creation of the courts of equity.

An important question here arises, as to the origin and history of this equity of redemption in this country, and particularly in our own and our mother State, Massachusetts.

It was and has ever been one of the boasts of New England, that our fathers brought here and established by naturalization the "common law of England." It has ever been in force here in its strictness, and its wonderful flexibility and power of adaptation to new relations and new exigencies. It is, to-day, the law of the land, except as changed by statute, or obsolete as to certain portions, by time and the extinction of customs and interests.

But our fathers did not bring with them to Massachusetts the court of equity, or the equity law, as expounded or created by that court. They did not bring the civil law, or any of its outgrowths, although, like wise men founding an empire, they, from time to time,

incorporated into their statute law many principles of equity and many modifications of the stern strictness of the old common law.

There is no doubt, that, from early times, the colonial laws recognized and yielded to the doctrine of a saving of strict forfeiture in mortgages by payment after the day, and provided a mode of securing that right by statute. At the same time, they took care to provide a mode of foreclosure and a limitation of the time during which the right to redeem might be claimed. They saw that the moment you depart from the strictness of the common law, two things are to be regarded as essential and vital. First, if the right to redeem, beyond the day, is given to one party, a right to enforce a forfeiture and foreclosure, within a reasonable time, must be given to the other.

Otherwise, the right might continue indefinitely. Now both these rights were created, and existed by statute, here and in Massachusetts, and always so in this State. The equity of redemption here was not the creation or creature of an equity court struggling and disputing with the courts of common law, and in danger of strangulation if it came within the grasp of one of the black-letter judges. Both rights here existed by positive law and legislative enactments. But the rights of both parties were well defined, both as to what mortgages came within the provision, and how the foreclosure might be enforced, and how the equity of redemption might be made available. Mortgages of real estate, alone, were provided for. Or rather, we should say, this right of equity and this right of foreclosure existed only in those cases where the statute gave or recognized them. There was no indefinite equity of redemption, created by equity courts, which could not be enforced by the existing modes, as pointed out in the statutes, but could only be foreclosed by a bill in equity. It may here be remarked, that, until quite recently, we have had no statute giving any right of redemption of pledges or mortgaged personal property, by payment beyond the day. And we have never known of any claim that such an equity existed and could be maintained by any process in law or equity. The strict old common law applied to such mortgages or pledges of personal

property here, until the recent statutes. The fact is illustrative of the position, that these rights are here the creation of positive law. Or, in other words, that the common law is the law of the land until some other power, sufficient to do it, has changed or modified it.

The equity of redemption, in real estate, has always, with us, been a well-defined and determined right. It is the right to redeem, by payment or performance, in three years after entry or process to foreclose the estate. It is, in one sense, a definite legal estate, for it has always been subject to conveyance by deed, and to seizure and sale on execution against the mortgager for his debts.

The process to enforce this right is given by statute, and is by a bill in equity. But the foreclosure, on the part of the mortgagee, has never been in this State by any process in equity. Such a mode is entirely unknown in our practice. There is no such authority given in the statute regulating mortgages. The statute is distinct in giving the remedy, by bill in equity, for redemption. But it gives, in detail, the modes by which a mortgagee, desirous of foreclosure, may proceed to effect his object. We have before stated all these modes, viz., by entry, by consent, by suit at law, by entry before witnesses, and by advertisement in a newspaper.

We repeat, because it is in our view an important fact, that the mode of foreclosing a mortgage, by a bill in equity, has never been known in this State. No such case can be found, we are quite sure, on our records. If the right existed in 1852, it was a dormant right, never having been used or recognized, nor specified in the statute before named as one of the modes to be pursued. If existing anywhere it must have been a latent, dormant, and undeveloped process inherent in this court, as a court of equity, in the same manner as it was claimed in early days by the English court of chancery.

But this court never has been a court of unlimited, general equity jurisdiction. It has never claimed or admitted the possession of such powers. Its equity powers are entirely the creation of the statutes, and have been, by statute, from time to time enlarged,

but always precisely defined. It was decided in *Leighton* v. *Leighton*, 32 Maine, 402, that this court has equity jurisdiction in those cases only in which it is conferred by statute. It was even held that where the statute gave expressly to the court equity jurisdiction "in all cases of waste," yet that this language did not give to the court all the powers possessed by courts having general equity jurisdiction in the matter of waste, but only to cases of waste at common law, where there was a privity of estate. It was admitted that the case of waste, presented by that bill, might justify a general chancery court, with full equity jurisdiction, in granting an injunction. The same point was so decided in Massachusetts in 5 Met. 150.

The well-settled doctrine, as expressed in the cases cited below, is that the equity powers of this court are conferred by statute and are there enumerated, beyond which is forbidden ground.

*T. & C. R. R.* v. *Myers*, 41 Maine, 109; *Hayford* v. *Dyer*, 40 Maine, 245; *Woodward* v. *Cowing*, 41 Maine, 9; *Frost* v. *Butler*, 7 Maine, 231; *Smith* v. *Ellis*, 29 Maine, 442.

It has been held that whatever the rules in equity might be as to set-off, they cannot prevail in this State when they are at variance with the provisions of our statutes relating to that subject. And so as to issuing injunctions. It is only when the power is given by statute that they can be issued. This was the condition of the law and the court, in relation to mortgages, in 1852, when this mortgage was executed. And we are now prepared to examine the precise question raised in this part of the case by the plaintiff. It is, as we understand it, nakedly just this. That the statute law of Maine, as it existed in 1852, was not applicable to mortgages of railroads; that, from the peculiar nature of these mortgages, there could be no foreclosure of them, except by bill in equity, without special provision of statute therefor, and that no such statute could be applied to such existing or prior mortgage, because it would violate the provision of the United States constitution, before named, prohibiting a State from enacting any law impairing the obligation of contracts. It is urged, that this was in substance in the nature of

a vested right, and so a part of the contract. That any other mode of foreclosure, although under a statute made for such cases, would violate the obligation of the contract.

It is strenuously pressed, in various forms, that a foreclosure by sale under a decree would be more advantageous to the mortgager, than a foreclosure of the title, so as to secure it to the mortgagee, and that this was a right inhering in the contract, and not part of the remedy. One answer to this view is to be found in what has before been shown, that a sale is by no means, even in the English practice, a fixed rule or established right in every case, nor is it a mode which either party can insist upon. The foreclosure may be strict, without sale, upon short notice and with not more than six months' time to redeem. The length of the Chancellor's foot is not more uncertain, than the precise order he may make.

It is, however, urged that where the foreclosure is by bill, all these chances are open in a court of general equity jurisdiction.

But if we come back to strict law or right, the question at once arises, whether, as matter of fact, there did not exist in 1852 any statute or other law in Maine, not merely giving the right, but compelling a party to foreclose any mortgage by a bill in equity? We have seen that no such law or rule was known or in use. Is not the argument on the other side stronger, that, as any equity of redemption can here only arise from or out of the law, and is not inherent in the common-law contract, if there comes up a new case before unknown and unprovided for, which, by reason of its character and complication cannot be dealt with, either as to its redemption beyond the day, or its foreclosure by existing laws, there is no equity of redemption, but the case, and the contract, and the deed, must stand and be regulated as to the rights of both parties by its terms at common law.

If there is a legal equity of redemption in such a case, how is it created? Can this court, with its limited chancery powers, create new species unknown to the statute or the common law? Can we make such an equity without a statute giving us the powers? And, on the other hand, can we say that we have power to create a new

Kennebec & Portland Railroad Co. *v.* Portland & Kennebec Railroad Co.

mode of foreclosure, beyond those so clearly and precisely given in the statute, giving not merely a new mode, but leaving the time, terms, and conditions of foreclosure to the discretion of a judge? Would not this be judicial legislation, or the assumption of all the equity of unlimited equity courts?

But if we assume that an equity of redemption could or might be thus created or recognized, it is apparent that it would be the creation of the law, by the court. At the same time, of course, the same law must create or recognize a right to foreclose and extinguish this equity. Now, if the law thus creates both, why may not the law through the law-making power define, limit, and provide a mode of enforcing this indefinite and latent power? How would such a statute-remedy violate the obligation of the contract? Clearly not unless it affected some distinct right or obligation, secured to a party to the contract, and entering into and making a part of it at the time of its creation.

It is important to keep in view the exact proposition, by which it is attempted to demonstrate that the obligation of this contract is violated. It is not that the obligation at common law is affected, but that an outgrowth of that contract (which is the creation of the court, or at best of the law) was one part of the original contract and incorporated into it, and that this right to redeem, thus created, could not be foreclosed by any existing statute, but only by a decree of sale by a court of equity, and that the legislature had no power to provide any other mode.

The first and sufficient answer to this proposition in this case is, that, as we have seen, there never had been, and was not at the time of the execution of this mortgage, any such existing right to this mode of foreclosure. It was unknown to our law and our practice. It has never to this day been known in our judicial tribunals. How then could it be regarded so a part of a contract, so fixed and so incorporated into it, so certain and unchangeable a right as against all other modes of foreclosure, that no judge, and no legislature could adopt any other mode, without violating the constitution of the United States?

As a matter of fact, then, we find no such existing law, rule, or right that prescribes this single mode of foreclosure, and, therefore, no basis for the essential proposition.

We are not without direct authority in our own court, touching the equity powers of this court, in reference to foreclosure of mortgages. It appears that in the revision of the statutes in 1841, an attempt was made to define the powers of the court, as a court of equity, in one section of the statute relating, not to mortgages but to the supreme judicial court and its jurisdiction. R. S., c. 96, 1841. Among the cases named, as those which the court might hear and determine as a court of equity, "when the parties have not a plain and adequate remedy at law,"· are the following:

"All suits for the redemption and foreclosure of mortgaged estates."

It was evident to every lawyer that the words "and foreclosure' were inserted by mistake, or if not, that they were entirely inoperative, and could not and did not confer any power on the court to alter the existing law as to the mode of foreclosing. The parties had a plain and an adequate remedy at law, and no mortgage could be foreclosed, except in the way the statute had pointed out.

The words in question had never been used before in any statute, and at most could only be applied when there was not a plain and adequate remedy by existing law, or by using equity to enforce existing modes of foreclosure. The statute gives no new power and no new mode.

It is worthy of remark, that, although the provision remained in the statute from 1841 to the new revision in 1857, yet no case can be found where it has been attempted to foreclose by bill in equity under it.

But the court was soon called upon to notice this interpolation, and to give a construction to it. In the case of *Shaw* v. *Gray*, 23 Maine, 178 (decided in 1843), the court says: "A court, having general equity powers, might compel him to place himself in the condition he would have been in, if he had merely procured the

mortgage to be discharged. . . . But 'the powers of this court, as a court of equity, are specific and limited by statute.   In regard to mortgages, it is confined to suits for the redemption or foreclosure thereof.   What is to be understood, in this instance, by foreclosure, it may be difficult to ascertain; for the legislature have prescribed, with precision, what shall be done to foreclose a mortgage.   This court, it is believed, are not vested with the power to decree a foreclosure in any case.   The acts which are to foreclose a mortgage are, in every case, to be those of the mortgagee, or of those standing in the place of the mortgagee.   It is not presumable that the legislature intended to superadd a power in this court, to adjudge or decree a foreclosure, upon grounds other than what they have specifically enacted to be such.   As to suits for redemption, the power delegated must have reference to the mode of proceeding particularly prescribed for the purpose."

Again, in 1845, the court, in *Chase* v. *Palmer*, 25 Maine, 345, says: " The proper proceeding against him would seem to be to obtain possession of, or to foreclose the mortgage.   Yet we do not understand such to be the object of the bill.   And if it were, though the court, by the R. S., c. 96, 1841, is in terms authorized to take cognizance, as a court of equity, of suits ' for the redemption and foreclosure of mortgaged estates,' it is believed that the statute concerning mortgages (c. 125) actually precludes any action of this court, sitting in equity, on the subject of foreclosing mortgages; the provisions of that statute containing the rules which must govern in reference thereto ; and none of them having reference to the action of a court of equity.   The language of the statute, therefore, as to foreclosing mortgages in a court of equity, is inappropriate, and must have been introduced inadvertently, without recurring to the specific provisions enacted for the purpose."

In the report on the new revision of the statutes, in 1857, made to the legislature by the late Chief Justice Shepley, who was a member of the court when the decision before cited was made, and who has been familiar with the law and the practice of this State since its formation, we find this note referring to this language in

the statute of 1841, giving his reasons for omitting them in the revision. He says: " The words ' and foreclosure ' are omitted as suited to mislead; the court having decided that it had no jurisdiction to foreclose a mortgage. 23 Maine, 174; 25 Maine, 341."

We find that the legislature adopted the suggestion and omitted these words in the R. S. of 1857. The clause there reads, " For the redemption of estates mortgaged." The foreclosure in this case was commenced in 1859, after the statutes of 1857 went into operation.

It seems, then, that the court of this State gave a construction to the language used in the statute of 1841, and decided that, even when the words in question were in the statute, the court had no jurisdiction and no power to entertain a bill in equity, to foreclose any mortgage, for the reasons set forth in their opinions. No mortgage was, in fact, thus foreclosed, whilst the words remained in the statute.

The legislature, under the suggestion before quoted, struck the words out in the revision. This was a clear, affirmative act, by which the legislature declared that no power should rest in the court to foreclose a mortgage by bill in equity. It was not a mere omission to provide that mode, but, under the circumstances, equal to a clear declaration that no such power existed or should be exercised.

The former statute, it was declared by the court, so far as these words are concerned, whilst existing, gave no power to foreclose in equity. The legislature affirmed the same doctrine, and omitted the words as useless and tending to mislead. So that there never was a time when the court had the power claimed. And even if there had been such power from 1841 to 1857, it was taken away by the omission in the new statute, which was in force when this foreclosure was attempted. The mortgagees were not bound to institute proceeding for foreclosure, until they saw fit, under a claim from the bondholders. It is for the mortgagee to determine when he will foreclose.

Even if the language, in the law of 1841, had any practical force,

yet surely the legislature might take away that power or mode of foreclosure, if they left the essential rights of the parties as they were prescribed and fixed by law, as to foreclosure, intact and unchanged. For those words gave no new rights to either party, or to the court to create any, or to decree any new mode of foreclosure as decided by the court in the above cases.

The legislature has power to alter remedies at pleasure. It could hardly be contended that this naked expression in the law of 1841, even if it had any force, so entered into and became part of the contract, as elsewhere explained, that mortgages executed between 1841 and 1857 must be foreclosed by a bill in equity, even after its repeal and in no other mode, and that the legislature had no power to alter or repeal the clause, because by so doing they would impair the obligation of the contract.

It will be observed that the words in question do not create or imply any new mode of foreclosure. Had not a mortagee, during this time, a right to foreclose by any of the modes pointed out in the statute then existing, by entry or suit or advertising? Clearly the provision, if operative, did not take away the right to use existing modes of foreclosure. If it did, then all the attempted foreclosures, during these sixteen years, are void. A result, to say the least, alarming in view of its effects in unsettling titles. But it did not.

The case does not, therefore, raise the question how far the legislature may alter or limit or extend a certain fixed and established mode or remedy, nor whether a given case comes under the definition of a remedy, or is one where a substantial right is violated or taken away. It is common learning, that the legislature may change at will remedies, but cannot impair rights or obligations. It might, probably, be seriously questioned whether the legislature could constitutionally abridge the time of redemption existing by statute at the time the mortgage was given, say from three years to one year. This would be taking away a fixed right, one that existed when the contract was made, given by the statute law of the State. It would take away two years' time, and give nothing in lieu

or exchange. But it could hardly be questioned that the legislature might vary or add to or diminish the different modes of foreclosure as to existing mortgages, provided no essential right that before existed was impaired. If the essential things, viz., on one side, three years' right to redeem, and on the other a mode of foreclosure by which reasonable notice must be given to the mortgager, are preserved, it matters but little what forms are adopted to enforce these rights. If a new case, not covered by existing statutes, arises, it would seem to be plainly the right and duty of the legislature to provide a mode by which the rights of both parties might be secured, following, if it saw fit, existing laws and forms and modes of proceeding as far as applicable, either to foreclose or to redeem. There could seem to be no objection to this unless it is plainly shown that some fixed, vested, or inherent right, existing at the time of the contract, is violated, as before stated.

Now in this case, the mode adopted by the statute was in substance and effect identical with one of the modes existing in 1852, viz., by advertising in a newspaper a certain number of times. The new statute gives the same time for redemption as the previous one, three full years. There is no objection made, that the time or notice was not sufficient, or that any right in these particulars had been infringed. The sole objection is that the mode of foreclosure was an infringement of an existing, fixed, and unalterable right to have a decree of absolute sale of the property within sixty days or some very short time. It might deserve consideration whether the granting of three years' time for redemption, if it were in lieu of a peremptory sale, would impair or diminish the right. But it is unnecessary to discuss this point. If it were essential, we might be unable to find the fact established that the complainant's essential rights were actually abridged, diminished, or injuriously affected by a three years' right of redemption before foreclosure, instead of a peremptory and immediate sale at auction. By our law, real estate is levied upon by an appraisement of three disinterested men, and the title is thus conveyed to the creditor, subject to a right of redemption in one year after the levy, by paying the appraised value

and interest.   In many other States such execution is levied by a sale of the premises by the sheriff, without any right of redemption.   By our law, also, a lien can be created on real estate, by an attachment of it on *mesne process*, which holds good until a levy on the execution, if made within thirty days after judgment.   Now if, in a State where the levy is made by sale, and such lien by attachment is recognized, the legislature, after such attachment and before judgment, should change the  mode  by adopting our law, by which all subsequent levies should be by the appraisement of three disinterested men, the debtor having a right to redeem in a year, could the debtor object that his right had been injuriously affected, and the constitution of the United States infringed ?

No one pretends that a mere change of form in the proceedings, or the substitution of one form of remedy for another, by which the same substantial result is reached, can work such a result.   It must appear, distinctly, that some fixed and absolute right or condition of the contract is impaired injuriously, to the party complaining.   That fact must be found and clearly established before any question of this nature can arise.

Our attention has been particularly called to the case of *Bronson* v. *Kinzie*, 1 Howard, 311, and it is cited as sustaining the argument on the part of the complainants.   On a careful examination, we do not find anything in the decision of that case, that militates with the views before expressed in this opinion.

The facts in that case were, in brief, these :  A mortgage given in Illinois, to secure payment of money on a day certain, containing a stipulation that if default be made in payment of principal or interest, the mortgagee might enter upon and sell the mortgaged premises at auction, and retain the amount due to him, rendering the surplus, if any, to the mortgager.

After this mortgage was executed, and before this bill to foreclose was filed, the legislature of Illinois passed a statute, which in terms applied to this mortgage, by which, in substance, a new equity of redemption in the mortgager was created, by giving him a right to redeem, after a sale, under a decree of a court of chancery for

foreclosure, by paying the purchase-money and interest in twelve months after the sale ; and, further, if the debtor did not pay within that time, any judgment creditor might, on like terms, within fifteen months, pay and thus redeem for his own benefit. Another statute, enacted at the same session, also provided that in all sales for foreclosure, under a decree in chancery, the property should first be appraised by disinterested men, and if two-thirds of the appraisal was not bid, it should not be struck off.

The question before the court arose under a bill for foreclosure ; the complainant claiming that he had a right to have a decree of foreclosure and sale, under the law of Illinois, as it existed before the new statutes were passed.

The court based the decision of a majority, in favor of the complainant, on the ground that the obligation of the contract " depended upon the laws of Illinois, at the time the deed was executed ; and that at that time, by that law, a mortgagee had an absolute and undoubted right, under an ordinary mortgage deed, if the money is not paid, to go into the court of chancery and obtain its order for the sale of the whole mortgaged property (if the whole is necessary), free and discharged from the equitable interest of the mortgagers." The court says: " This is his right, by the law of the contract, and it is the duty of the court to maintain and enforce it." This " right," as before shown, does not, by the law of Maine, exist in the mortgagee and never has, and, therefore, this decision rests upon a vital fact, not found in the case before us. It is admitted, in the argument in this case, that there was no statute law authorizing a foreclosure by a bill in equity, providing in its terms a mode of procedure, nor is it asserted that any such course was ever known in our practice. The argument is that such a course of proceeding was according to general equity practice, in courts of general equity jurisdiction, and might, therefore, have been resorted to in this case, and that, in fact, it was the only mode by which this mortgage could have been foreclosed. We have fully considered this proposition.

The court, in the case under consideration, after stating the common-law doctrine of absolute forfeiture of the estate, at the day, by

non-payment, and the equity view of a resulting trust after the debt is paid, says that "courts of equity lend their aid, either to the mortgager or mortgagee, in órder to enforce their respective rights. The court will, upon the application of the mortgager, direct a reconveyance to him upon payment of the money." We have in Maine, by our statute, authorized this form of proceeding, on the part of the mortgager, to redeem. The court then goes on to say : " And upon application of the mortgagee it will order a sale of the property to discharge the debt. But as courts of equity follow tʰ. law, they acknowledge the legal title of the mortgagee, and never deprive him of his right at law until his debt is paid, and he is entitled to the aid of the court to extinguish the equitable title of the mortgager in order that he may obtain the benefit of his security." Then follows the language first quoted, as to his "absolute and undoubted right" to such a mode of foreclosure. The court then says : " When this contract was made, no statute had been passed by the State changing the rules of law or equity in relation to a contract of this kind. It must, therefore, be governed, and the rights of the parties under it measured, by the rules above stated. They were the laws of Illinois at the time."

The opinion holds that by those laws then existing the mortgagee, in an ordinary mortgage, independent of the special right of sale stipulated in that deed, had a fixed, certain, and definite right to a foreclosure, under a bill in equity instituted by him, and to a decree of the court of equity for an absolute and immediate sale of the premises, by which his debt might be paid. That this law was incorporated into the contract and became a part of it. By the existing laws and practice of Illinois, mortgages are foreclosed by bill in equity.

The statute of Illinois did not attempt to change any form or take away the right to obtain a decree for a sale, but undertook, in the first place, to create a new equity of redemption after such sale, first for one year to the debtor, and he failing to redeem, for fifteen months to any judgment creditor of the debtor. And, not content with this, by a subsequent act, abrogated the right to sell under

such decree, unless two thirds of a value fixed by appraisers should be offered at the auction sale. The court did not regard these new provisions as a mere change of remedy, a mere alteration of the form of reaching the same result, but as creating new and distinct rights and conditions, in and under the contract, injurious and unjust to the mortgagee, by giving a new estate, which before had no existence, to the debtor, and in a contingency to any judgment creditor. " If," say the court, " such rights may be added to the original contract, by subsequent legislation, it would be difficult to say at what point they must stop. The statute gives to the mortgager and to the judgment creditor an equitable estate in the premises, which neither of them would have been entitled to under the original contract, and these new interests are directly and materially in conflict with those which the mortgagee acquired, when the mortgage was made. Such modifications of a contract, by subsequent legislation, against the consent of one of the parties, unquestionably impairs its obligation and is forbidden by the constitution."

The court also animadverts on the other provision, as to the new condition annexed to the sale, and shows how it might operate to prevent any sale or greatly delay the remedy of the creditors.

The court is careful to distinguish between a remedy and a right. It says: " Although a new remedy may be deemed less convenient than the old one, and may, in some degree, render the recovery of debts more tardy and difficult, yet it will not follow .that the law is unconstitutional. Whatever belongs merely to the remedy, may be altered according to the will of the State, provided the alteration does not impair the obligation of the contract. But if that effect is produced, it is immaterial whether it is done by acting on the remedy, or directly on the contract itself."

This case, we may remark, would more nearly resemble the one before us, if the debtor in Illinois had complained against the creditor, when he, abandoning his original right to foreclose absolutely by sale, had proceeded under the new statutes, yielding the new right of redemption to the debtor and causing an appraisement to be made. The court could hardly find grounds for sustaining such

complaints, where it was manifest that no proceedings, injurious to the debtor, were shown or could be established.

The real question before us is, whether the debtors or the mortgagers have a right to insist upon a particular mode of foreclosure of his mortgage, when the mode adopted and sanctioned by the legislature is perfectly satisfactory to the mortgagee and has been adopted by him. What obligation of the contract is violated, under proceedings which secure the right to redeem amply and to the full extent known under any law of the State? How is he injuriously affected?

But even if we had before us the mortgagee, complaining of the statute mode of foreclosure and claiming a decree for a peremptory sale, our answer must be, "we can find no law or practice in this State, which gives you a right thus to foreclose. None such existed when you took the mortgage, and therefore no such right could make a part of your contract, as it did in the case cited under the laws of Illinois." The distinction between the cases is obvious and clearly marked in several particulars, but chiefly and fundamentally in the existence in one case, and the non-existence in the other of this fixed right. Our view of the effect of the mode of foreclosure, adopted in this case, has been fully stated. It is in substance that it neither gives any new right nor takes away from either party any vested or conceded or established right existing or in force when the contract was entered into, and violates no provision of the constitution of the United States.

The result upon this part of the case is, that, in form and substance, the foreclosure was sufficient to extinguish the right of redemption as claimed by respondents, unless rendered inoperative from other causes and for other reasons, hereafter to be considered.

But the complainants urge that the redemption should be open to them, even if the proceedings should be found to have been regular in form, and such as would bar them in the absence of other facts. They insist that the trustees were guilty of such laches, bad management, and illegal if not fraudulent combinations with other par-

ties to secure a foreclosure, when it might, and should have been, prevented by them; that the whole proceedings, however formal, should be set aside as in fact a fraud upon the plaintiff corporation, subjecting them to a foreclosure, when it was the duty and within the power of the trustees to have prevented it.

In considering this branch of the case, it becomes important to ascertain the exact condition of the trustees, and their relation to the several parties in interest. They were appointed by the stockholders of the plaintiff corporation at the time the vote was passed, authorizing the issue of the second mortgage bonds, and before any of the bonds had been sold, and, of course, before there were any second bondholders in existence. The deed to the trustees was executed within ten days after the vote.

At this time, the corporation was in possession and running and managing the road. The trustees were then mere mortgagees, out of possession, with no other rights or duties than such as related to holding and enforcing the mortgage. This deed was delivered in October, 1852, and the bonds thus secured were sold to different holders. The coupons were paid until 1856, but after the first of April of that year, payment of the coupons of this class ceased, and also of the first mortgage bonds, to secure which, a prior and similar mortgage had been made to the same individuals as trustees.

After this failure to pay the coupons due, the directors of the corporation by vote authorized "the president to enter into an arrangement with the trustees of the holders of the bonds, whereby they may take possession of the road" upon certain conditions or understandings. In this vote the directors admit the non-payment, and give their consent that trustees might enter and take possession of the road, under their mortgage deed, and hold the same until the interest due upon those bonds should be paid. The vote then specifically points out how the proceeds are to be applied, and the order and priority of payment. The last of all being the "coupons on the bonds of 1852" (the second mortgage bonds).

It does not distinctly appear that any subsequent formal agreement was made by the president and trustees. But this vote of

the directors, who spoke and acted for the corporation, clearly indicates a conviction that the corporation was unable to meet its immediate liabilities, and was willing that the trustees should take possession and apply the proceeds according to the order set down.

The counsel for the plaintiff corporation, in his argument, assumes and claims that the possession taken by the trustees in September, 1857, was taken under this vote, and was continued under its terms and conditions. The paper appears among the exhibits of the defendants. It is not signed by the trustees or president, but shows only votes of directors. The answer of the surviving trustee (Mr. J. Patten) states that this entry, under the second mortgage, was made in accordance with the directions duly given by the second bondholders, at a meeting duly called, organized, and held for that purpose. The R. S. of 1857, c. 51, authorized such proceedings. We do not find among the exhibits any copy of such vote of the bondholders.

But if the entry and the taking of possession were in either mode, it is clear it was not taken for the purpose of foreclosing the mortgage. It was a possession for the purpose of taking the income, earnings, and receipts of the road, to be applied, if the entry was made under the vote of the directors, according to its terms, if under the vote and direction of the bondholders, according to the provisions of the statute.

The trustees were thus in possession. They evidently had duties to perform toward two parties. One, the corporation that designated them and whose property and railroad they had taken, the other, the bondholders for whom they held the property in trust and in mortgage. It was substantially the case of a mortgagee in possession before breach of the condition, or before entry for the purpose of foreclosure.

As such trustees it was their duty to manage the property with reasonable care, prudence, and faithfulness, to apply the net income according to the legal rights of all parties. But it is evident that under that entry and possession the mortgage in question was not and could not be foreclosed so as to devest the equity of the corpo-

ration. The trustees, thus holding, might be liable to the parties in interest for any neglect, fraud, or misconduct, but such possession, however long continued, would not extinguish the equity.

But in May, 1859, a number of the holders of the second mortgage bonds applied to the same trustees, then in possession as before described, to foreclose the second mortgage on the ground that the interest coupons thereon had not been paid since April, 1856.

In compliance with this request, the trustees proceeded to advertise for a foreclosure in pursuance of the statute of 1857. According to that statute, which, in this respect, resembles the general statute of 1841, this notice would be effectual to foreclose, although no possession was taken under it. This mode, indeed, gives no right of possession, nor, in itself, does it affect any existing possession. The trustees remained, as before, in possession under their first entry. The notice for foreclosure, however, was a fact which was of great importance, and of vital interest to both the parties for whom they were trustees.

A mortgagee in possession is, undoubtedly, in an important sense, a trustee for the mortgager and bound to regard his interest. These trustees knew that in three years the equity would be foreclosed and it was their duty to prevent this consequence if they could legally, and had the means or money in their hands which they could properly and consistently, with their obligations to others, and with their duty under the law or stipulations under which they acted, apply to the payment of those second mortgage coupons, due and unpaid. And we think, further, that if, having such means, they diverted them to other illegitimate objects, or entered into combinations with others to allow the time of redemption to run out, when it could have been prevented by the use of earnings or assets in their hands, which might, under their responsibilities and duties, have been so applied that the foreclosure should not be set up or be held effectual.

Again ; if by intentional mismanagement or neglect, or by such gross and clearly proved misfeasance in their office and inattention to the wants and interests of the road as would amount to con-

structive fraud, the income was thereby reduced so as to affect the net profits, which a different mode of administration would have produced, which profits would have been or might have been, with other means in their hands, properly applied to the payment of these coupons, before the three years would have expired, and would have been sufficient, that the same result as to the strict foreclosure would follow. It would be against right, reason, and fair dealing to hold otherwise.

This brings us to the consideration of the charges in the bill on these points. We must keep in mind the fact that the two parties are the corporation and the body of second bondholders, and that it is the acts and proceedings and conduct of the trustees that are in question. The questions raised touch them only in the result, although any connection or combination with others, if proved, may be important and may properly be considered if they bear upon that point.

The obligation was on the corporation to pay its debts, but as the source from which the money to pay them was expected to be derived was given into the hands of the trustees, it is but reasonable to require, in behalf of the original corporation, that the road should be managed, and the income applied, so that, if possible within the prescribed duties and obligations, a foreclosure might be prevented. At the same time the trustees are not to be held to do impossibilities, or what they had not legitimate means to do. They were not in possession, it must be remembered, of unlimited and unrestricted powers to do what they pleased with the income of the road. The law (R. S., c. 51) plainly points out their duty and limits, and specifies the order of appropriation of the income they may receive. This statute should be read in this connection.

The vote of the directors, as before shown, clearly and distinctly required a specific and progressing order of payments or appropriation to separate classes of claims, under seven heads, each being postponed to the preceding.

This brings us to a consideration and examination of the precise allegations in the bill, which are the only grounds which we can properly consider.

It is nowhere directly asserted in the bill that the trustees, at the time when the foreclosure, as claimed, became perfected, or at any other time had, actually, money in their hands, which they might legally and should have applied to the payment of the coupons due on these bonds. But it is alleged, " that the said trustees so carelessly, negligently, and unskillfully managed said railroad and its affairs, while in the possession thereof, that the net earnings and income received by them were much less, to wit, in the sum of two hundred thousand dollars per annum, than they should have been and would have been if the same had been faithfully and properly managed by said trustees, and in accordance with the spirit and fair intent of said trusts."

There is another allegation in substance the same. It is that from the time when the trustees became possessed of the railroad, it has been of great value, and sufficient, if administered according to the true tenor and effect of the trust, and of the equitable liens with which the same was charged by the corporation, to have paid the interest upon the bonds, and should have been so applied. There is also an allegation that a majority of the directors, combining with the trustees for the purpose of becoming the owners of the railroad, neglected to pay the interest upon and redeem the bonds.

There is no allegation in the bill of willful, intentional, corrupt, or designed mismanagement or neglect. The charge is of negligence and unskillfulness. The trustees were John Patten, Joseph McKeen, and M. S. Hagar. They were designated by the plaintiff corporation for the trusts imposed by the deed, and for all the duties which might thereafter devolve upon them as such trustees.

The corporation knew them and reposed great trust and confidence in them. It is apparent from the evidence, that it was well known to all, that they were not men having experience in the direct management of an operating railroad. It would hardly be reasonable to hold them responsible under the circumstances, for the highest skill, or for failure, in managing the road up to the highest point of success which it is possible might have been reached by experienced, long-tried, and exceptionable managers.

The charge is general.  No specification of any particular instances, or detail of any definite failure or mismanagement is set forth in the bill.

The answer of the surviving trustee (Mr. Patten) distinctly denies the charge of mismanagement, and asserts the contrary.  He avers that they did their best, and employed as superintendent a man of good reputation for skill, integrity, and experience, and gave their personal attention so far as required.

Is this denial overcome by the proof?   In judging of the success and management of the road, it is fair to regard the condition in which it was, financially and structurally, when the trustees received it.   Its financial condition is referred to, and may be gathered from the vote of the directors in 1856 before referred to.   It is there stated as a reason for consenting to surrender the road to the trustees, that the coupons had not been paid, and that the directors had not the means at present to take up these coupons.

Comparing the receipts and expenditures after the trustees took possession, with those of the immediately preceding years, we do not find the comparison unfavorable to the trustees.   It is shown that the credit of the road was at a low ebb, and that the trustees used their private credit, at times, to keep it in operation.   It does not appear that the corporation or its officers or the stockholders, at any time before the foreclosure, preferred complaints in any formal manner, if at all, as to the mismanagement of the road.

The testimony on this point introduced by the plaintiffs is rather of general impressions, beliefs, and suspicions that matters were not managed as well as they might be, than of any definite and distinct facts.   It would be difficult for any master or auditor to state or fix upon any specific instance of neglect or want of skill, for which a sum of money should be charged to the trustees.   It may be granted that the road, owing to various causes, was not yielding what might have been secured by a first-class road in a first-rate condition in all respects.   There may have been, and probably were mistakes, and errors and miscalculations and disappointments to some persons who desired to use the road for transportation.   It would be tedious

and useless to go over all the evidence bearing on this point. On a careful and candid examination of it all, we have no hesitation in coming to the conclusion that the evidence fails to overcome the answers on this point, or to establish the charge within the rule before stated.

The next charge in the bill is, in substance, that the three trustees McKeen, Patten, and Hagar, "while acting as trustees and being in possession, combining with a majority of the directors named, and with R. D. Rice, John B. Brown, George F. Shepley, and H. N. Jose and others, contriving and intending to obtain for themselves and their associates the possession, management, and ownership of the railroad, franchise, and rolling stock, and to deprive the plaintiff corporation of the same, for that purpose bought in a large amount of different kinds of stock, bonds, coupons, and mortgages and other claims, which the plaintiff corporation was bound to pay and redeem, amounting to about seven hundred thousand dollars, and the plaintiffs allege that they are informed and believe, that these purchases were made with the money belonging to the corporation, being the earnings of the railroad, and that all this was done by the said trustees, directors, and other persons in connection and combination, for the purpose and with the intent as before set forth.

To this charge Mr. Patten answers, that it is not true; that he never had part in or knew of any such combination or purchase; that the other trustees, so far as he knows or believes, never combined or purchased as charged; that he has no knowledge or belief that any such purchase was made by the other trustees or other persons named in the bill. Mr. McKeen and Mr. Hagar, both deceased, before the bill was filed, or before any answer was made. Mrs. Hagar, as administratrix of her husband, in her answer, adopts the answer and denial of Mr. Patten. All the other parties to the bill, in their answers, deny any such combination or purpose, or any connection of the trustees, as such, with any purchases.

We cannot find evidence in the case to overcome the denials. The testimony of defendants sustains the denial in the answers of

any such fraudulent or unfaithful and dishonest combination, purpose, and acts on the part of the trustees. The testimony on the part of the plaintiffs fails to sustain it. The accounts, as presented, do not show any appropriations of the earnings of the road for such purpose. We speak now of the general charge of combination between the directors, trustees, and other persons to purchase the stock, bonds, coupons, etc., of the road, and the actual application of the funds of the corporation for the purpose of obtaining possession of the road and its entire franchise and property. The next charge, however, is more specific, and relates to what is called the Williams purchase, and is evidently more relied upon than the general charge above stated.

The charge in the bill is, in substance, that Reuel Williams, deceased, was the owner in his lifetime of original, preferred, and Yarmouth stock, bonds, coupons, and claims secured by a mortgage of the rolling stock, to the amount of five hundred thousand dollars, or thereabouts, and that in the year 1861 he offered to sell and dispose of the same to the trustees, for the benefit of the plaintiffs, for $113,000, or about that sum, being much less than the real value; but the trustees, contriving and intending to obtain for themselves and their associates the ownership of the road, declined to accept the offer and make that purchase, which, in the proper exercise of their trusts, they should have made.

This charge is also very distinctly and positively denied in the answers, and we find no testimony which establishes the facts charged against these denials, and the testimony of those who were concerned in the actual sale and transfer of these securities by Mr. Williams.

But the bill proceeds to make another charge against the trustees, in relation to this Williams' purchase, and avers that after declining to purchase for the corporation, as before stated, Rice and Alden purchased them of Williams for the benefit of the trustees and their associates, and for the purposes before set forth, for the same sum ($113,000) which was paid to Williams out of the earnings, income, and profits of the road; and that instead of surrendering the said

purchased securities and obligations to the original corporation, as in justice they should, they claim to hold the same against and to recover the same in full of them.

Then follows the several allegations before referred to, that the trustees, directors, and the other persons before named combined together for the purpose of becoming owners of the road, and to effect that object, in violation of their trusts, neglected to pay the interest upon and redeem the bonds.

This matter of the Williams purchase forms a prominent part of the evidence and arguments in the case. The answers deny the charge of any connection of the trustees, in their capacity, in the original purchase from Mr. Williams.

On a careful examination and consideration of the evidence on this point, we cannot find sufficient evidence to sustain the allegation as made, viz., that the purchase by Rice and Alden of Williams was made for the benefit of the trustees alone, or with associates, in pursuance of a combination or agreement or understanding between the persons and parties named, to obtain possession and the property in the railroad for themselves, in fraud or wrong against the corporation, and that the earnings of the road were used for that fraudulent purpose. There is evidence which tends strongly to prove that one of the trustees (Mr. Hagar) had had conversation with Rice, concerning his proposed purchase, and that he was willing and desirous of being one of the company to purchase, if the terms were satisfactory. He died before the final contract with the trustees, but his administratrix was allowed to come in as one of the company (Rice and others), who sold to the trustees. But there is no sufficient evidence that in whatever he did or commenced, in relation to or in connection with the purchase by Rice of Williams, he was acting in his capacity of trustee, or using or promising to use the earnings of the road to carry out any illegal purpose. He seems to have acted as a private individual on his individual responsibility in this matter. And he was but one of three persons on the board, and could not if he would thus divert the earnings without the consent of his associates, acting as a board.

The facts do not show, to our apprehension, the combination and purpose as charged against the trustees. They do show that there was a proposal and plan started to obtain, by purchase, of Mr. Williams his securities and claims, and that this plan and purpose was understood by several persons, and that there was a more or less distinct and binding agreement or understanding between Rice and other persons as to participation in the trade, and that these persons were some of them directors and some owners, by purchase and otherwise, of the bonds of the company. There is a considerable indefiniteness and want of clearness in some parts of the testimony as to this purchase, so far as others than the trustees were concerned.

But we must remember that the second bondholders, whose mortgage is, if foreclosed, the entire basis of the defense, were not responsible for the acts, intentions, or combinations of the directors or stockholdhers of the plaintiff corporation, or of the holders of other bonds. The trustees named in the deed were their trustees, and it is their acts or neglects alone, that the second mortgage bondholders can be held answerable for.

Now how stood matters from the time of possession by the trustees, up to the time of foreclosure, in May, 1862? The trustees had assumed a second possession, anew, for the first bondholders in September, 1860, about one year and a quarter after the possession taken under the second mortgage in question. But it is to be marked, that in neither case did they enter for the purpose of foreclosure, nor have they ever claimed a foreclosure by virtue of an entry, and continued possession. The foreclosure, if legally made, was made solely by virtue of the published notice, and the expiration of three years from its date, and so far as the foreclosure is in question, the possession is immaterial. There are allegations that the first bondholders commenced proceedings to foreclose, but we find no evidence of such attempt among the exhibits. The whole question rests upon the proposition that the mortgage of second bondholders was legally foreclosed. If not, the defense fails confessedly.

Although the evidence does not satisfy us that there was any unfaithful combination, on the part of the trustees, with others, to use the funds of the company to purchase the securities of Mr. Williams as before stated, yet it is admitted and clearly proved that the trustees did afterwards negotiate with Rice, the purchaser, for the sale and surrender to them of a portion of the bonds, etc., obtained from Mr. Williams, and agreed to pay therefor the sum of $110,000. The contract, as finally consummated, was dated Feb. 17, 1862, and the trustees, McKeen and Patten, agree to pay the above sum in semi-annual payments of $10,000 each, with interest, the first payment to be made on the 20th of March, 1862. These payments were to be made out of the net earnings of the road after paying certain special claims, being those which had priority over the first and second bonds. This contract was entered into in pursuance of the vote of the first and second bondholders, who had been separately organized into corporate bodies, under the statute of 1857. This contract, it will be observed, was signed about three months before the foreclosure of the second mortgage, under the advertisement.

It appears from the accounts, as stated, that in the year 1862, $28,300 was paid on this purchase, and the balance was paid in full in the year 1863.

The question is now reduced to this, whether the trustees, under the direction of the bondholders, diverted money and means in their possession and control which ought to have been applied to the payment of the over-due coupons of the second mortgage bonds by which the foreclosure might have been prevented. If they did, we do not see any reason why the foreclosure should not be disregarded and the plaintiffs let in to redeem. It was their duty to prevent a foreclosure, if they had means sufficient, which, without violation of prior rights, or the law or the obligation imposed and resting upon them, they could thus use.

They say they had no such means. As before stated, the bill does not directly assert that they had. It does charge that the directors, combining with the trustees and others, for the purpose

of becoming the owners of the road, neglected to pay the interest upon and to redeem the bonds. But the directors were the officers and agents of the plaintiff corporation, the bondholders were not responsible for or liable to account for the neglects or misdeeds of such directors.

The bill, in its whole structure, seems to be based upon the alleged unfaithful, if not corrupt combination and plan between the directors, trustees, and others to defeat a redemption. We have before considered these charges in detail. Nevertheless, we should have little hesitation in holding, even in the absence of proof of the combination or conspiracy, that, if the trustees had funds in their hands which they might legally and properly (as before explained) have paid to redeem these coupons of the second mortgage bonds, their neglect or omission to do so would have saved the foreclosure.

The three years for redemption expired about May 18, 1862. In order to save the foreclosure, the whole amount due on these coupons must have been paid. The payment of even a large amount, if not sufficient to pay the " uttermost farthing," would have been of no avail. Now the trustees say that they could not do this for two reasons. The first, that they had at no time, after they took possession, net earnings sufficient to meet these demands. That the arrears of coupons on these bonds, in May, 1862, was between seventy and one hundred thousand dollars.

And they say, secondly, that whatever surplus means they had, they were bound to apply to demands of a prior date, having by the statute and by law precedence. They say that if they had paid these coupons, they would have been liable to other parties and to the charge of mismanagement in their office. They say that the question here must be determined by the state of facts existing prior to May 18, 1862, and that subsequent events or subsequent success or subsequent application of the money or assets of the new company or of the bondholders after foreclosure cannot change or vary the legal rights of the parties.

If the trustees had not funds which they could and should have used for this redemption, the plaintiff and complaining corporation·

knew that the foreclosure had been commenced; that in three years it would be complete, if the whole of this debt against them was not paid; that the corporation, and not the trustees, were the debtors; that if the trustees had no such funds at the day, the forfeiture of the estate was inevitable, and yet it does not appear that any effort or any offer of aid was made by the corporation or individual stockholders, but the time was allowed to elapse with all the resulting consequences of a new corporation, etc., provided in the statute. These facts and considerations might not be sufficient to estop the complainants, if the charges made had been sustained, but they cannot escape notice as belonging to the history of the case and the consideration of the proceedings of the trustees.

After a careful consideration of this part and the evidence to sustain these grounds of the case, we can find no sufficient reason for declaring the foreclosure ineffectual.

There would seem to be no legal objection arising from the sub-. sequent acts of the trustees, or of the new corporation, if the trustees were not guilty of want of due diligence, in not redeeming before the expiration of the three years, as before explained. The only legitimate use that could be made of these subsequent facts, either in relation to the income of the road, or of the use of the funds, would be to connect them as far as they bore upon the previous proceedings. But taking the whole evidence together, and keeping in mind the exact point to be established, our conclusion is that the bill must be dismissed.             *The bill dismissed.*

APPLETON, C. J.; and CUTTING, J., concurred.

WALTON, DICKERSON, and DANFORTH, JJ., concurred in the result.

BARROWS, J., did not concur.

The following dissenting opinion was drawn by

TAPLEY, J.   The complainants in this bill being an existing corporation, duly chartered and organized under the laws of this State, on the 15th day of October, 1852, made a mortgage to certain

persons named as trustees, and for purposes indicated in the mortgage. The description in the mortgage is of " all their corporate property, real and personal, and the franchise of said company," " and the right of way."

On the 18th day of May, 1859, the said trustees, claiming there had been a breach of the conditions of this mortgage, gave notice that they claimed to foreclose it, and proceeded to effect a foreclosure of the same, by pursuing the mode pointed out in R. S. of 1857, c. 51, § 55.

It is now claimed that the proceedings thus had, and the lapse of time thereafter without redemption, have invested the respondents with all the chartered rights of the complainants.

The complainants, on the other hand, contend that the procedure was wholly ineffectual, because inapplicable to this mortgage.

The mortgage thus sought to be foreclosed was made on the 15th day of October, 1852.

The statute under which proceedings were had for the purpose of foreclosure was first passed in 1857.

One question discussed is whether this statute affected mortgages made before it was passed.

The first section of the act referred to (now § 53, c. 51, of R. S. of 1857) provides that " Whenever a railroad corporation shall have mortgaged its railroad and franchise to secure the payment of any of its bonds or coupons, whether such mortgage was made directly to the holders of such obligations or to trustees for their use, the refusal or neglect to pay any such bond or coupon within ninety days after a presentment (subsequent to its pay-day) to the treasurer or president, for payment, shall be deemed a breach of the condition of the mortgage."

This is the only section affording any light in the settlement of this question.

An act of the legislature will not be regarded as retroactive, unless the intent plainly appear from the act itself, either by its terms or by necessary implication. The presumption of law is against it. This view has been expressed by many of the ablest jurists in this country and in England for many years.

Although it may seem like "but repeating household words" to note any of them, yet I think a reference to a few of them now may be of utility.

In Mr. Sedgwick's work on Statutory and Constitutional Law, may be found some comments and citations upon this matter. He says: "The effort of the English court appears, indeed, always to be to give the statutes of that kingdom a prospective effect only, unless the language is so clear and imperative as not to admit of doubt."

The principle, say the English Court of Exchequer (2 Exch. 22), "is one of such obvious convenience and justice, that it must always be adhered to in the construction of statutes, unless in cases where there is something on the face of the enactment putting it beyond doubt that the legislature meant it to operate retrospectively."

In an early case in N. Y. (4 J. R. 45), Thompson, J., said: "It may, in general, be truly observed of retrospective laws of every description, that they neither accord with sound legislation nor the fundamental principles of the social compact. How unjust, then, the imputation against the legislature, that they intend a law to be of that description, unless the most clear and unequivocal expressions are adopted." Kent, J., said, on the same case: "I think it can be shown that the act cannot be adjudged to operate either as a new rule for the government of a past case, or as interpreting a former statute for the direction of the courts; and I should be unwilling to consider any act so intended, unless that intention was made manifest by express words; because it would be a violation of fundamental principles, which is never to be presumed."

Various other cases are referred to in the same State, by the learned author, sustaining these propositions. In a case in Mississippi, it is said a retrospective operation should not be allowed unless required by "express command or by necessary and unavoidable implication."

"It is a general rule, applicable to all laws, that, generally, they are to be considered as prospective, and not to prejudice or affect the past transactions of the subject. It is not intended by this rule

that the legislature cannot, in some cases, make laws with a retrospective operation. But this effect is not to be given to a statute, unless such intention is manifestly expressed." *Whitman* v. *Hapgood*, 10 Mass. 437.

" For it must be admitted that all retrospective laws are repugnant to the principles of sound legislation and the permanent security of rights." *Inhabitants of Somerset* v. *Inhabitants of Dighton*, 12 Mass. 383.

In our own court, in the case of *Hastings* v. *Lane*, 15 Maine, 134, Shepley, J., in delivering the opinion of the court, says: " In the case of *Dash* v. *Van Kluck*, 7 Johns. 477, Kent, C. J., states it to be a principle in the English common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect. The same rule is recognized in *Whitman* v. *Hapgood*, 13 Mass. 464. And such must be regarded the settled rule unless the intention to have it operate retrospectively is clearly expressed."

No statute is to be held retrospective or in violation of any constitutional provision when it affects rights, unless such shall be the necessary construction. *Given* v. *Marr*, 27 Maine, 212.

In the case of *Bryant* v. *Merrill*, 55 Maine, 515, decided by the court as now constituted, Dickerson, J., in giving the opinion, says: " A retroactive effect will not be given to a statute unless it clearly appears that such was the *intention of the legislature.*" The discussion in that case shows how rigidly the rule was adhered to, the judge saying, " It is not from inference alone that a statute of such grave character should be held to have a retroactive effect."

Citations of this kind could be multiplied to great numbers, and from every State in the Union, showing how clear, exact, and rigid is the rule, and how strictly adhered to.

The same rule of construction prevails in the Federal courts. Judge Story, in *Prince* v. *United States* (2 Gall. 204), says: " It is a general rule that statutes are to be construed to operate *in futuro* unless from the language a retrospective effect be clearly intended."

Kennebec & Portland Railroad Co. v. Portland & Kennebec Railroad Co.

In *Harvey* v. *Tyler*, 2 Wall. Sup. Ct. Rep. 328, the court say: "It is a rule of construction that all statutes are to be considered prospective, unless the language is express to the contrary, or there is a necessary implication to that effect."

Numerous other cases might be cited, and they all concur in stating the rule as in this last case, viz., to give a retroactive effect to a statute, the court must find some expressed intention of the legislature in the act, that such was their design, or this conclusion must be forced by necessary implication from the act. It is not enough that the language of the act is susceptible of such a construction; the intention must be " manifest," " clear," " indubitable," and free from doubt.

As before remarked, this may seem very much like the repetition of " household words," the reiteration of an " undeniable proposition," and, therefore, unnecessary; but the observation of all has, I think, led to the conclusion that such rules when they become maxims of the law lose all their application, somewhat of their force, unless occasionally examined with a view to understand their full force and legal effect.

In view of this rule, how stands the statute before us upon this question.

It will be noticed that the first, and indeed the controlling word used is *whenever*, and not *wherever*.

*Wherever* would have more clearly and distinctly signified " in all instances;" as if it had read, " in all instances where a railroad shall have mortgaged, etc." The word *whenever* is not so significant of a design to embrace all instances past and future. It is an adverb of time rather than place, and, speaking from that time, its indication is future rather than past. It is also coupled with the words " shall have," belonging to the future perfect tense, and indicating an act to be done and perfected in the future, before the happening of some other event. These words used with the word *whenever* are strongly indicative of the future. Indeed, they hardly seem susceptible of any other construction.

This section also provides what shall be considered a breach of

the mortgage ; it introduces a statutory breach upon the happening of which only can the remedy provided be applied. It fixes the acts to be done. Requires demand, and names the persons upon whom demand is to be made. It fixes a specified time which must elapse before there is a legal default, none of which were required by any existing law.

If we hold this law retroactive we must assume these things were done and required with reference to past contracts, and supersede all former laws so far as they are inconsistent with it. We must ignore the rule of construction we have found to be of such ancient date and so well preserved, and substitute in its stead the very reverse of it.

If we adhere to the rule, we shall find everything in the act consistent with it.

Its phraseology is literally prospective. It requires a violent hand to make it otherwise. Its provisions in substance, as well as in form, are all consistent with prospective action only. To assume that the legislature intended to declare there had been no default in any past mortgage of this character, except where the specific demand contained in this act had been made, and the time therein mentioned had elapsed, is to charge upon them an act neither creditable to their intelligence or integrity.

If there had been a breach in existing contracts of this kind, under existing laws, there was a manifest impropriety in undertaking to declare that there had been none, or to render nugatory the defaults then existing.

If there had been no such breaches in the past, there was no occasion for retroactive legislation concerning them ; in any event it would seem that so much of the act was designed to be prospective only.

To these suggestions may be added the inquiry, by way of argument, if the legislature had designed this statute, so important in all its bearings, a statute affecting materially both public and private rights; one in which the new element of transferring a franchise, and rights acquired under the law of eminent domain is introduced,

should have a retroactive effect, would they not have declared it in plain and unmistakable terms? Is not the absence of clear, unequivocal expression of such design very strong proof of the absence of such design?

Now looking at this act, as we find it upon the statute book, is there anything in it which "clearly" indicates the design of the legislature to make it retroactive? Does it by "express provision" require such a construction?

Does such a construction arise by "necessary implication" from its provisions?

I think these questions must be answered in the negative.

Instead of these things appearing, it seems to me the contrary appears, and instead of being a case requiring the court to give it a retroactive effect, it is one by its own terms forbidding such a construction.

It is admitted that all the proceedings had for the purpose of foreclosure have been had under the statute of 1857, and it follows, if the statute was not retroactive, they have acquired no title by virtue of its provisions.

It is further argued that if this statute be regarded as retroactive in its operation and affecting the mortgage in this case, it would impair the obligation of the mortgage contract and be invalid as to these complainants.

If it should appear, upon examination, to operate injuriously upon existing mortgages, it would present another strong reason why the court should not give it a retroactive effect, and this reason would be equally strong and cogent whether it affected the one party or the other injuriously, for we cannot hold it retroactive as to one party and not as to the other.

The party whose interests are operated upon beneficially might not be in a condition to complain of the change in the law, while the party whose rights were injuriously affected might; but the fact that the rights of one party to the contract were injuriously affected would raise a strong presumption against the idea that the statute should operate upon past contracts irrespective of the posi-

tion they occupy, in any case before the court. The same party might in one case be complainant, and in another respondent, and the statute of retroaction in one case must be held to be so in the other.

This leads us to the consideration of whether or not any change in the law was affected by the statute, and what that change was.

It will not require much argument to show there was a change, and that a change was designed. We can hardly suppose the legislature went to work to simply reënact that which was in existence, but that in such a statute important changes were designed, and it is only necessary to read the statutes, as they existed, relative to mortgages in 1852 and the statute of 1857, to lead to the conclusion, that, in point of fact, important changes were made.

In this connection it is well to note that the statute of 1857 was not one of substitution, but was either affording a new remedy where none existed, or a cumulative one where there was another provided by law. It did not attempt the repeal of any existing law. Such as were in existence remained as before.

At the time this mortgage was made, the statute of the State provided certain methods of proceeding, whereby the right which a mortgager had of redeeming real estate mortgaged by him might be foreclosed.

These statutory provisions are found in c. 125 of the R. S. of 1841.

Two classes of cases are distinctly provided for, and entirely distinct methods provided for each class.

The first class is where possession is had by the mortgagee (§§ 3 and 4), and the second class is where no possession is had (§§ 5 and 6).

In the first class a possession obtained in either of the modes there described, " being continued for the three following years, shall forever foreclose the right of redemption."

These modes were, first, an action at law, and obtaining possession under a writ of possession; second, entering into possession,

Kennebec & Portland Railroad Co. *v.* Portland & Kennebec Railroad Co.

and holding the same by consent in writing of the mortgager, or the person holding under him; and third, entering peaceably, openly, and not opposed, in the presence of two witnesses, and taking possession of the premises. In the last case certain certificates are required to be made and recorded.

The second class of cases is where the mortgagee " is not desirous of taking and holding possession of the premises." In such case " he may proceed for the purpose of foreclosure, in either of the two following modes, viz.: first, he may give public notice in the newspaper, printed in the county where the premises are situated, or if there be none such, then in an adjoining county, or in the newspaper published by the printer to the State, three weeks successively, of his claim by mortgage on such real estate, describing such premises intelligibly, and naming the date of the mortgage, and that the condition in the same has been broken,. by reason whereof he claims a foreclosure ; and cause a copy of such printed notice, and the name and date of the newspaper in which it was last published, to be recorded in each registry of deeds, in which the mortgage deed is, or by law ought to be recorded, within thirty days after such last publication ; or, second, he may cause a copy of such notice to be served and attested as a true copy, by the sheriff of the county or his deputy, in which the mortgager or his assignee lives, if in this State, by a delivery to him in hand, or by leaving the same at his place of last and usual abode ; and shall cause the original notice and the sheriff's return thereon to be recorded within thirty days after such service in manner aforesaid."

" The mortgager, or person claiming under him, may redeem the mortgaged premises within three years next after taking possession, or publication or service of notice mentioned in the preceding sections, and if not so redeemed, his right of redemption shall be forever foreclosed."

These are all the statutory provisions relating to the foreclosure or mortgages of real estate.

The same chapter by § 30 provides, that, " When the condition of any mortgage of personal property has been broken, the mort-

gager, or any person lawfully claiming or holding under him, may redeem the same at any time within sixty days next after said breach, unless the property shall have been sold in the mean time, in pursuance of the contract between the parties, or on execution for the debt of the mortgager."

This is all the statutory right of redemption given in cases of personal property.

With this view of the law before us it is well to recur to the mortgage to see what was sought to be conveyed. Upon examination of that it will be found to describe it as, " All their corporate property, real and personal, and the franchise of said company including the road and superstructure, and all the land conveyed to said company by others," " as well as the right of way paid for, and all the buildings thereon, and the personal property, consisting of engines and tenders, passenger, freight, platform, and dirt cars, snow-ploughs, and apparatus of every description." Here we have real estate, personal property, right of way, and franchise, *eo nomine*, all in the same instrument.

What corporeal things would be affected by proceedings under the statute relative to real estate, and what under that relative to personal property, it is not necessary now to determine.

That a franchise comes within the purview of either section before referred to, we think will hardly be contended by any. In the enumeration of the securities in the mortgage, it does not seem to be treated as belonging to either, but as an independent right, as indeed it is, incorporeal in existence. We are not aware that it has ever been regarded the subject of seizure, and sale upon execution.

A franchise, says Bouvier, is a certain privilege conferred by grant from the government, and vested in individuals, and has no inheritable quality. Substantially the same definition is given by Burrill. Chancellor Kent says the same, and adds, " corporations or bodies politic are the most usual franchises known in our law ; these incorporated franchises seem, indeed, with some impropriety, to be classed by writers among hereditaments, since they have no inher-

itable quality, inasmuch as a corporation, in cases where there is no express limitation to its continuance by the charter, is supposed never to die, but to be clothed with a kind of legal immortality." 3 Kent's Com. 459.

It is undoubtedly a privilege which the sovereign power alone can grant, whether it be the king or the people assembled in legislative bodies.

Now what was the franchise in this case, specified in this mortgage as " the franchise of said company." A recurrence to the grant (its charter) will show substantially, it was the privilege of being a body politic and possessing the powers incident to such bodies; the privilege of taking lands of individuals *in invitum* for the purpose of constructing a railway; and the right to construct, maintain, and manage such railway, and in so doing levy and collect tolls upon and from travelers thereon.

Now assuming the corporation had a right and full power to make a conditional sale and transfer of their franchise received from the State (the very right, among other things, to be a corporation), to what provision of the statute law was it subject?

Was it subject to that which pertains to real estate? Was the right to be a body politic real estate? Is the right to construct a railway real estate? Is the right to levy tolls upon passengers, when it is constructed, real estate? Were these things designed to be embraced within a term that had for centuries been well defined, and used in this statute and those from which it was copied long before railroad franchises were thought of? Such an idea may well be characterized as ridiculous.

Were these rights appurtenant to the real estate of the company? This would seem to be answered by the fact that they existed before the company had any real estate, and that they are the subject of specific grant, and that, too, from the sovereign power, and not possessed by any individual owner of the land they now own, and could not have passed from them to the corporation.

Another inquiry suggests itself, and that is, why does it appertain any more to the real estate of the corporation than it does to its

personal property, every particle of which comes to them long after the franchise has been granted and accepted.

It seems to me quite apparent that it is not subject to the provisions of the statute before referred to (c. 125 R. S., 1841).

It is said if this be so, why should not the old common-law doctrine apply of a forfeiture of the entire right on failure of strict compliance with the terms of the deed? Such, inevitably, would be the result if no relief from that forfeiture could, under any existing law, be obtained, and then we should have the anomalous case of one set of individuals owning the franchise, and another owning the real estate, personal property, and easement of a railroad, neither very valuable possessed alone, and one, the franchise, entirely useless without the other, and the right of redemption in the company property of little or no value, because the franchise had absolutely and irrevocably passed from them.

If one rule is applied to the realty, and another to the personal property, and still another to the franchise, there is this constant liability to separation and destruction by separation; yet such must have been the case in 1856, when the complainants failed to pay the interest due on the obligations secured, if there was no other remedy than that found in the statute quoted. The franchise must have passed by irredeemable forfeiture immediately; and the title passed to the personal property in the same way, at the expiration of sixty days after the breach, while the real estate and all its appurtenances, however extensive they were, remained the property of those who were the corporation; and we might here inquire, to whom passed the franchise and who became invested with the franchise named in the mortgage, made not to the holders of the obligations but to trustees for their benefit? We are now contemplating the state of affairs prior to the passage of the act of 1857, upon the assumption that it was competent for the company to make such a mortgage, and the only relief that could be given from the consequences of a non-compliance with the terms of the deed must be found in the statute we have referred to.

Assuming, then, as contended by the respondents, that there were

no other provisions of law than those contained in the chapter referred to touching this matter, and that the statute of 1857 is retroactive, how stands the case?

By the act of 1857, whenever a railroad corporation shall have mortgaged its railroad and franchise, certain proceedings may be had to foreclose the mortgage, and at any time within three years from the commencement of such proceedings the mortgagers, or persons claiming under them, were authorized to redeem by payment or tender of payment of the amount of overdue bonds and coupons secured by said mortgage (§ 55, c. 51, R. S., 1857).

This law, if binding and retroactive, would give a right of redemption from the forfeiture of the franchise where none before existed, and where, by the common law, it had actually been vested in others, and passed from these complainants a year before the act of 1857 was passed.

It appears there was a non-compliance with the terms of the deed in April, 1856, and for this these respondents proceeded, under the statute of 1857, to foreclose. As a practical question, where was the franchise from April, 1856, to the time of the passage of the act of 1857? If it had passed to these respondents, was there, during that time, any law by which these complainants could be relieved from the effects of a forfeiture by the non-compliance with the conditions of the deed? The respondents say, none but the provisions of c. 125, R. S., 1841, and those, it will be perceived, were entirely inapplicable to this franchise. The consequence is, as before stated, that the statute of 1857 gives a right of redemption for the three years after a perfect indefeasible title had vested in the mortgagee and been thus vested nearly one year.

Then, as to the personal property, if the provisions of c. 125, R. S., 1841, were applicable to it, a perfect and indefeasible title in it had vested in the mortgagees, upon the expiration of sixty days from April 1, 1856, and long before the act of 1857 was passed; yet, regardless of this, the act of 1857 would give a three years' right of redemption, instead of the sixty days which had elapsed.

To meet this obvious condition of things, concerning the franchise,

it is said : " In this case the franchise, the right to be a corporation and to exact and secure tolls and fare, becomes of little practical importance to the present defendant corporation.   If the foreclosure of the mortgage, on the other property mortgaged, was perfect and sufficient, the statute authorized the body of bondholders to organize as a corporation and to, in effect, assume a new franchise."

If this position is, in fact, true, we should find two corporations possessing the same franchise.   The franchises of the old corporation would remain undisturbed, applicable to the whole line of road, and a new franchise, authorizing the same thing to be done in the same place and at the same time, would be held by another body of individuals,— a state of affairs, to say the least of it, a little embarrassing.

But the answer to this proposition does not rest upon such anomalous or incongruous results, but is found, in the statute itself, giving not a new franchise, but transferring that belonging to the complainants.

The proposition made would entirely ignore the conveyance of the franchise, and proceed as if it was a nullity.   Now upon recurring to the act of 1857 it will be seen that it applies only to those cases where the franchise is conveyed (§ 53, c. 51, R. S., 1857), and that " if the foreclosure be effectual, it shall enure to the benefit of all the holders of bonds and coupons provided for in its condition.   And they, their assigns, and successors are hereby constituted a company, incorporated and chartered, as of the day of the foreclosure, for all the purposes of the original company, with all the chartered and legal rights and immunities which pertained to the original company at the time of the foreclosure ; and it shall be the duty of the trustees, by deed of release, to convey to such new company all the rights and interest by them held in said railroad, appurtenances, and franchise, and other property, by virtue of their deed of trust and the foreclosure thereof " (§ 57, same chap.).

These provisions of the statute, relied upon, afford a complete answer to the proposition.

Then if we hold the act retroactive and valid, the consequence

is, the creation of a right of redemption where none before existed, and an indefeasible title had accrued, as to the franchise, and the extension of a right of redemption as to the personal property which had vested long before the act was passed, an extension in time very much beyond that which existed when the contract was made.

Such consequences, it seems to me, ought, in the absence of "express words" of retroaction or by "necessary implication," to forbid the construction contended for; and again I remark, the fact that such provisions operate beneficially to these complainants, cannot in the least degree change the fact that the statute is prospective only. In the consideration of this question it matters not who are complainants or who respondents. In familiar but expressive phrase, "it is or it isn't" retroactive, and this irrespective of parties. Whatever their position as to each other, it acts with the same effect upon the contract, and cannot be retroactive as to one and prospective as to others.

In this connection I will merely advert to one other thing appearing in the case, viz., "the right of way" which is attempted to be conveyed; without, at this time, discussing the right to transfer an easement of this kind, acquired by virtue of the law of eminent domain, we may well inquire under what provision of the law for the foreclosure of mortgages, in c. 125 of R. S. of 1841, would that kind of right fall.

Is it real estate? Is it anything more or less than an incorporeal right? The fee in the land remains in the original owner; his right to use, occupy, and assign is as full as before, if the use and occupation does not conflict with the limited right of use granted by the legislature. It must be remembered that it is not a general right of way that is granted, but one limited in its use and connected with the franchise granted at the same time. It is, to say the least, extremely difficult to see how, under the law as it stood in 1852, they could be separated, and it is quite evident if separated the right of way would be of no practical utility.

These and other considerations, excluded by the length to which this discussion has extended, impress my mind with the impolicy

and indeed injustice of a judicial decree, that a statute shall operate retroactively, when the legislative powers have not so declared, and I am clearly of the opinion, that, under the rules of construction applicable in such cases, the act is not retroactive, and its provisions do not affect mortgages in existence at the time it was made.

The question we have discussed thus far is, whether or not the act of 1857 was designed to be, and is, in fact, retroactive, affecting alike past and future mortgages.

It remains now to consider the other branch of the proposition, and that is its conflict with the constitutional inhibition of legislation which impairs the obligation of existing contracts.

Further argument or proof that it does this, seems to me to be unnecessary. The answer made is not a denial, but an allegation that this conflict is beneficial instead of injurious to the complainants. Assuming, for the present, such to be the case, is the act any the less in conflict with the constitutional provision referred to ? Does it make any difference whose interests are sacrificed in determining the naked question of conflict ? It seems to me this, too, is too plain for argument, and that the answer in nowise meets the material proposition that it is thus in conflict. If thus in conflict, and the parties were reversed, could the act be sustained as a rule of action ?

Judge Taney, in delivering the opinion of the supreme court of the United States, in *Bronson* v. *Kenzie*, 1 Howard, 311, says: "As concerns the obligation of the contract, upon which this controversy has arisen, they depend upon the laws of Illinois (Maine) as they stood at the time the mortgage deed was executed. . . . In other words, the existing laws created and defined the legal and equitable obligations of the mortgage contract. If the laws of the State, passed afterward, had done nothing more than change the remedy upon contracts of this description, they would be liable to no constitutional objection. . . . Whatever belongs merely to the remedy may be altered according to the will of the State, provided the alteration does not impair the obligation of the contract. But if that effect is produced, it is immaterial whether it is done by acting

on this remedy, or directly on the contract itself. In either case it is prohibited by the constitution. . . . It was undoubtedly adopted as a part of the constitution, for a great and useful purpose. It was to maintain the integrity of contracts, and secure their faithful execution throughout this Union by placing them under the protection of the constitution of the United States; and it would ill become the court, under any circumstances, to depart from the plain meaning of the words used, and to sanction a distinction between the right and remedy, which would render this provision illusive and nugatory; mere words of form affording no protection and producing no practical results. . . . Mortgages made since the passage of those laws must undoubtedly be governed by them, for every State has the power to prescribe the legal and equitable obligations of a contract to be made and executed within its jurisdiction."

In *Green* v. *Biddle*, 8 Wheaton, 75, it is said, if the remedy afforded be qualified and restrained by conditions of any kind, the right of the owner may indeed subsist, and be acknowledged; but it is impaired and rendered insecure, according to the nature and extent of such circumstances.

The foreclosure of a mortgage and the sale of the mortgaged premises must " take place according to the statutes in force at the time of making the mortgage, at least so far as the substantial rights of the mortgagee would otherwise be injuriously affected. *Shuts* v. *Peabody*, 7 Blackford, 613; Id. 154, cited in note 4 Kent's Com. 182.

These citations fully sustain the position, that the rights of parties under such contracts must be determined by the law as it stood when they were made.

In the apt and appropriate words of Chief Justice Taney, " the existing laws created and defined the legal and equitable obligations of the mortgage contract."

They sustain also the proposition, if the obligation of the contract is, in effect, impaired, whether done by acting on the remedy, or directly on the contract itself, it is equally in conflict with the provision of the federal constitution, before referred to, and cannot be sustained.

That there is such a conflict between the statute of 1857, if retroactive, and the constitutional provision referred to, it seems to me admits of no doubt, and we are again brought back to the allegation that this conflict is not injurious, but rather beneficial to the complainants, and, therefore, in this case immaterial.

It will be perceived that this proposition will make the act of 1857 a law for this contract or not, at the option of the respondents. If the respondents choose to adopt it, it is the law. If they choose to reject it, it is not. So that the complainants have this for their law or not as the respondents may choose. If it be thus optional with them, why may they not say to these complainants, that as to you, we choose to regard this as a valid and subsisting law, but as to the first mortgagees, as void? As to our foreclosure effectual, but should the first mortgagees pursue the same course, ineffectual.

The question here may have at present no other practical application than the determination of the principle invoked, for the respondents in their answer say that they " have made arrangements with the first mortgage bondholders, to prevent the consummation of the proceedings to foreclose that mortgage." Should these arrangements fail, the parties might stand different.

Is a law thus optional, or is it not rather a law applicable to the contract, and not subservient to the wishes of the person. Again we come to the phrase, it is a law or it is not.

It seems to me clear, that the law so far as it impairs the obligation of the mortgage contract, in this case, is void.

Is there any rule of practice or pleading, at law or in equity, which prohibits a party from setting up the invalidity of law, relied upon by the opposite party? I find no decided case. holding such a doctrine. All the authorities, when treating of this question, say such statutes are void.

It is indeed no rule of action in the construction and execution of those contracts thus affected by it.

The complainants do not rest upon this position, but present another which requires consideration.

They urge that the statutory provisions existing in 1852 for the

foreclosure of mortgages do not reach and cover a mortgage like this, and were not designed so to do; that they applied to cases of the ordinary mortgage of real estate, and that no proceedings at all were required in case of the ordinary mortgage of personal property.

The remedy, if any existing, by which the right of redemption in the case at bar could be closed upon the complainants, they contend, was by appeal to the equity court.

This idea is strenuously opposed, and is as strenuously insisted upon.

I find no clearer, better, and perhaps more authoritative statement of the law applicable to mortgages, where not modified by statute, than in the case already cited of *Bronson* v. *Kinzie*. Chief Justice Taney there says: " According to the long-settled rules of law and equity, in all the States whose jurisprudence has been modelled upon the principles of the common law, the legal title to the premises in question vested in the mortgagee, upon the failure of the mortgager to comply with the conditions contained in the proviso; and at law he had a right to sue for and recover the land itself. But in equity this legal title is regarded as a trust estate to secure the payment of the money; and, therefore, when the debt is discharged, there is a resulting trust for the mortgager. *Conrad* v. *The Atlantic Insurance Co.*, 1 Pet. 441.

It is upon this construction of the contract that courts of equity lend their aid, either to the mortgager or mortgagee, in order to enforce their respective rights. The court will, upon the application of the mortgager, direct the reconveyance of the property to him upon the payment of the money; and upon the application of the mortgagee it will order a sale of the property to discharge the debt. But as courts of equity follow the law, they acknowledge the legal title of the mortgagee; and never deprive him of his right at law, until his debt is paid; and he is entitled to the aid of the court to extinguish the equitable title of the mortgager, in order that he may obtain the benefit of his security. For this purpose it is his absolute and undoubted right, under an ordinary mortgage

deed, if the money is not paid at the appointed day, to go into the court of chancery and obtain its order for the sale of the whole mortgaged property (if the whole is necessary), free and discharged from the equitable interest of the mortgager. This is his right, by the law of the contract; and it is the duty of the court to maintain and enforce it without reasonable delay."

If we regard this as a correct statement of the law where no statutory provisions exist modifying it, we are brought directly to the question whether any such statutory provisions existed in Maine at the time the mortgage in question was made.

We have before recited all that were then in force, and considered their inapplicability to the franchise and the right of way, and being inapplicable to them, their inaptitude as to the real and personal property embraced in the mortgage.

That they fail to reach the necessities of such a case it seems to me quite apparent, and that there was no way under the provisions of those statutes by which any equity of redemption, held by the complainants under their mortgage, could be closed. Indeed, I understand counsel upon both sides to assert this, and rely upon it, the respondents urging it as a reason why the statute of 1857 should be held by the court to be retroactive.

At this point I deduce this argument, viz., if these statutes did not reach this mortgage, then they did not modify the law relative to it, as we find it stated by Chief Justice Taney, in *Bronson v. Kinzie*, and the law, as there stated by him, is applicable to this case for the same reason he gave for its being applicable to that case, viz., because "no statute had been passed by the State, changing the rules of law or equity in relation to a contract of this kind, and it must, therefore, be governed, and the rights of the parties under it measured, by the rules above stated."

If these statutes were apt and applicable to the case, there was no propriety in proceeding, under the statute of 1857, to foreclose, and certainly no necessity for the court to declare the act retroactive.

But it is suggested that even if this be so, this court has no

jurisdiction, as a court of equity, to foreclose a mortgage, since the statutes provided a specific course of procedure in that matter, and several decisions are referred to in support of this position.

It is, I think, sufficient, or well at least to say here, in regard to those cases, that neither of them involved such a question, and the remark there made, concerning the power of this court to decree a foreclosure in any mortgage, is entitled to the force only which may properly be attached to a *dictum* of the court. The remark was made with a clear statutory provision conferring power as a court of equity in the foreclosure as well as redemption of mortgages. R. S., 1841, c. 96, § 10. Another thing should be noted, the remark was made concerning mortgages clearly within the statutory provisions referred to in c. 125 of R. S. of 1841, and did not apply to those not within the provisions of that statute, for the court say: " The legislature have prescribed with precision what shall be done to foreclose a mortgage. It is not presumable that the legislature intended to superadd a power in this court to adjudge and decree a foreclosure upon grounds other than what they have specifically enacted to be such." If the case at bar comes within the class referred to, viz., those which had been specifically provided for, then the reasoning used might be applied to it, whether conclusive or not ; but not being within that class, neither the reasoning nor the *dictum* which results from it applies. However this may be, it is said that in the revision of 1857 this provision was left out, the court having decided it had no jurisdiction to foreclose a mortgage, and, therefore, there was no such power possessed by the court at the time these proceedings to foreclose were commenced.

This last proposition is of little consequence if the former was correct. The leaving out of a statute something that was not in it before, does not very materially change it. If it was there, however, leaving it out would materially change the statute, and that subsequent to the making of the mortgage in this case.

It is very clear that it was provided by statute that this court, " as a court of equity," " had power to hear and determine " " all suits for the redemption or foreclosure of mortgaged estates "

(R. S., c. 96, § 10), and possibly had such a case arisen as that at bar, instead of those cited, the court would have concluded that this provision applied only to such cases as were not provided for in c. 125; that recognizing the law, as stated by Chief Justice Taney in *Bronson* v. *Kinzie*, they would have recognized the ancient maxim, *ubi jus, ibi remedium*, and given it the reasonable application to such cases.

I do not, however, think it necessary to discuss any further, at this time, the effect of the introduction or exclusion of the specific words, " or foreclosure," upon any mortgage made while they remained upon the statute-book, for I feel quite certain that in any case where no other provisions of law are applicable, the power of this court over trusts would furnish a complete and ample remedy, so that all cases of mortgage, whether coming within the statutory cases provided for or not, would find a means of execution. In the language of Chief Justice Taney, " In equity the legal title which vests in the mortgagee is regarded as a trust estate to secure the payment of the money; and, therefore, when the debt is discharged there is a resulting trust for the mortgager."

The case at bar, however, differs from the ordinary mortgage or is not dependent upon this principle to raise a trust. It is upon its face a declared deed of trust made to others than the holders of the obligations to be secured, and it may well be doubted if it is at all subject to any of the rules pertaining to mortgages, being not a mortgage in the ordinary use of the word, but a deed of trust upon conditions annexed.

In this deed the trustees were appointed by the grantors, and named as trustees to hold the property as a security for others, and runs to the trustees and " their successors in that trust."

The fact that it is a deed with defeasance, does not make it any the less a deed of trust.

The relation of trustee and *cestui que trust* is created by the instrument itself, and existed from the moment of its execution.

It was, in its inception, a declared trust and a trust by deed.

The fact that there is a condition annexed to the deed, which, if

performed, would extinguish the trust, does not change the character they hold in either before or after the breach of that condition. They are, both before and after such breach, trustees, and must answer to all parties interested as such. Had the condition been performed, they would have been answerable as such, and if they take anything by non-performance, they take as such.

It appears to me they are clearly answerable as such in the present instance, and that the other parties claiming to hold under them, with a full knowledge of the trust, and indeed claiming under it, as well as claiming to be the only *cestuis que trust*, are properly made parties to the bill.

If it shall appear that the debt is discharged, the court may direct a reconveyance by the trustees. If not, it may direct such reconveyance, upon such discharge, at such times as it shall determine.

If it shall find the trustees guilty of fraud or negligence in the execution of the trust, of which the other parties were or were not the guilty participators, such decrees can be made as will do equity in the case.

If this view of the law, as applicable to this case, be correct, it becomes apparent that the act of 1857, if it had been designed to be retroactive, would have so materially changed the rights of parties that it could not be sustained on application to the case at bar.·

I hold, therefore,

1. That the statute of 1857, c. 57, was not retroactive, and did not affect this contract.

2. That the statute laws of this State existing in 1852 and prior to 1857, providing methods of foreclosing mortgages of real estate, and those pertaining to personal property, were not applicable to the deed in this case.

3. That the statutes having in nowise modified or changed the rights of these complainants, the trustees held the title in trust, and are answerable as such.

4. That this court, as a court of equity having jurisdiction over

trusts, may make such decrees as the equitable rights of the parties may require.

5. That a master should be appointed with appropriate instructions, and such decrees should be made in the premises as shall secure the equitable rights of both parties.